**B.F. HAWK, Jr. and Sue Hawk, Petitioners/Appellees,**

v.

**Robert S. HAWK and Bay K. Hawk, Respondents/Appellants.**

Supreme Court of Tennessee, at Knoxville.

June 1, 1993.

Marvin B. Berke, Chattanooga, for appellants.

Phillip C. Lawrence, Chattanooga, for appellees.

Charles W. Burson, Atty. Gen. & Reporter, Dianne Stamey Dycus, Asst. Atty. Gen., Nashville, for State.

## OPINION

DAUGHTREY, Justice.

We granted review in this case primarily to decide the constitutionality of T.C.A. § 36–6–301 (1985), the Grandparents' Visitation Act, as it applies to the decision of these married parents to deny the paternal grandparents visitation with their grandchildren. Because we conclude that the application of the statute to the facts in this case violates the constitutional right to privacy in parenting decisions, under Article I, Section 8 of the Tennessee Constitution, we reverse the decision to award visitation to the children's grandparents.

We recognize that, under normal circumstances, children are "fortunate to have caring and loving grandparents, and ... that everything possible should be done to foster and maintain a close, loving relationship between the grandparents and the[ir grandchildren]." *Clark v. Evans*, 778 S.W.2d 446, 449 (Tenn.App.1989). The circumstances of this case were far from normal, however.

The record reflects a family history of bickering and personality clashes that ultimately resulted in a decision by the appellants, Bob and Bay Hawk, that neither they nor their children, Megan and Steven, would associate with Bob's parents, appellees Bill and Sue Hawk. A brief review of the facts is necessary to explain the situation that confronted the trial court when it granted the grandparents extensive visitation rights with their grandchildren, a decision that was affirmed by the Court of Appeals.

At the time of the initial petition, all of the parties resided in Chattanooga, Tennessee. Bill Hawk owned and operated a bowling alley where his son, Bob, also worked from 1985 until May 1989, when Bill terminated Bob's employment. During Bob and Bay's marriage, the two couples were frequently together, attending the same church, visiting on Sunday afternoons, and often visiting during the week. Bay and her mother-in-law, Sue, bowled together and spent Wednesday afternoons with the children. Moreover, the children were often permitted to spend the night with their grandparents. Before Steven was born, Megan spent two nights a week with her grandparents, but later each child spent one night a week with Bill and Sue. In addition, the grandparents often acted as baby-sitters for the children.

Despite these frequent visits, rifts developed between and among various members of the Hawk family. One of the primary clashes, originating even before Bob and Bay's marriage, seems to have arisen between Bay and her father-in-law. As time went on, their relationship deteriorated even further. Bay's testimony revealed, for example, her disapproval of Bill's methods of dealing with the children. On the other hand, Bob's testimony reflected his father's disapproval of Bay; after Bob and Bay's first argument, Bob said, his father recommended a divorce and publicly cursed Bay in Megan's presence. Bob testified further that his father frequently criticized him for not "standing up" to his wife "as a man." Bill, it appears, also disapproved of Sue's close relationship with Bay. After he had fired Bob from the bowling alley, this animosity resulted in a volatile scene in Bob and Bay's driveway that became so intense that Bay reported the incident to the police.

Among other things, there were serious disputes between family members about whether and how the children should be disciplined, disagreements about the chil-

dren's activities and bed-time schedules, and the like. In addition to these problems, Bob and Bay feared the influence on their children of Bob's brother, Billy, a convicted drug violator who was around the children while they stayed with their grandparents. Moreover, after several of Bill's short trips with the children became long excursions, Bay and Bob required Bill and Sue to notify them before taking the children anywhere. Occasionally, the children were not permitted to visit their grandparents when these rules were broken. The relationship between the couples became more strained as these disagreements intensified.

In May of 1989, Bill terminated Bob's job at the bowling alley, citing Bob's poor job performance. Bob complained that his father had used the job as a blackmail tactic to gain control over Bob's family. After Bob's termination, Bill opposed Bob's unemployment compensation and proposed to buy up Bob and Bay's family cemetery lots in the family plot. It was at this point that Bill's relationship with the younger Hawks was essentially severed. A few months later, after an explosive family argument, Sue also ceased her relationship with Bob, Bay, and the children.

Christmas that year provided an unsuccessful attempt at reconciliation. The entire family gathered at Bill and Sue's house, where Bay's disapproval over Sue's seating arrangements resulted in a quarrel. After the holidays, Bill agreed to counsel with Bob and the church minister; however, Bob refused to counsel with a person whom he considered to be biased. Thus, no family counseling has occurred. Except for chance encounters, the families have apparently not been together since the end of 1989; Bob and Bay have refused to accept Bill and Sue's gifts for the children and have rebuffed their efforts to contact Megan and Steven. As a result, family relationships have dissolved into a state of entrenched animosity, and each party interprets the events leading to the separation differently.

Unable to see the children with their parents' approval, the grandparents sought court-ordered visitation with Megan and Steven pursuant to T.C.A. § 36–6–301, which allows a court to order "reasonable visitation" with grandparents if it is "in the best interests of the minor child."[1] Al-

1. A history of the Tennessee grandparents' visitation statute appears in *Clark v. Evans*, 778 S.W.2d 446, 448–449 (Tenn.App.1989). The common law did not recognize a right of grandparents to visit a grandchild over the objection of the child's parent(s). A movement to create such a right by statute can be traced to the 1960's and 1970's and was undoubtedly the product of the nation-wide increase in the number of families broken by divorce. However, the original Tennessee statute, Public Acts 1971, Ch. 74, permitted a court to order visitation only where "the father or mother of an unmarried minor child is deceased ... upon a finding that such visitation rights would be in the best interest of the minor child." In 1975, the legislature broadened the statute to permit court-ordered grandparent visitation when the parents of a minor child were divorced. In 1985, the statute was again amended, to delete the necessity of the death or divorce of the parents as a predicate for court-ordered visitation.

There have been very few reported decisions under T.C.A. § 36–6–301 (1985). In *Clark v. Evans, supra,* the Court of Appeals held that the burden of proof rests upon the grandparents to show that visitation is in the grandchild's best interest. 778 S.W.2d at 449. We construed the prior statute in *Adoption of Bowling v. Bowling,* 631 S.W.2d 386 (Tenn.1982), which involved termination of visitation by paternal grandparents

pursuant to an adoption of minor children by a maternal grandparent following the murder of the children's mother by their father. In *Rowland v. Tate,* 797 S.W.2d 618 (Tenn.App.1990), the Court of Appeals was asked to determine what forum constituted a "court of competent jurisdiction" to entertain a petition for visitation by grandparents. The constitutionality of the statute was not questioned in any of these cases. "Wide-open" grandparent visitation statutes have been widely criticized by legal commentators as potentially disruptive of the right of parental supervision over children. *See, e.g.,* Note, *Tennessee Statutory Visitation Rights of Grandparents and the Best Interests of the Child,* 15 Mem.S.U.L.Rev. 635, 652–3 (1984–5); Bean, *Grandparent Visitation: Can the Parent Refuse?* 24 U. Louisville J.Fam.L. 393 (1985–6); Burns, *Grandparent Visitation Rights: Is It Time for the Pendulum to Fall?,* 25 Fam.L.Q. 59 (Spring 1991); Schoonmaker, Narwold, Hatch & Goldthwaite, *Constitutional Issues Raised by Third-Party Access to Children,* 25 Fam.L.Q. 95 (spring 1991); Note, *The Constitutional Constraints on Grandparents' Visitation Statutes,* 86 Colum.L.Rev. 118 (1986). Moreover, it has been suggested that forced visitation in a family experiencing animosity between a child's parents and grandparents merely increases the potential for animosity and by its very nature cannot

though the court did not find that Bob and Bay were unfit parents, it found their objections to visitation to be rooted in a family conflict that the court believed should not interfere with the children's relationship with their grandparents. The trial judge therefore ordered visitation for two full weekends in odd months, one weekend in even months, two weeks in the summer, and Thanksgiving and Christmas afternoons. Overriding the parents wishes, the court added that the grandparents "don't have to answer to anybody when they have the children." The court elaborated:

> They can take the children to visit friends of theirs, they can have friends in to visit with the children. They can take the children anywhere they please. They can also take the children on vacation during the time that they have them for the two week period of time, and they're not restricted as to where they can take them, because the Court is fully convinced that they would not do anything or take these children anywhere that would adversely affect these children.

In making this ruling, the court imposed its own opinion of the "best interests" of the children over the opinion of the parents, who had agreed between themselves that visitation was inappropriate.[2] Although courts are commonly called on to resolve custody disputes between parents and to determine custody when parents are unfit, the trial court's interference with the united decision of admittedly good parents represents a virtually unprecedented intrusion into a protected sphere of family life. Because the statute, T.C.A. § 36–6–301 (1985), suggests that this level of interference is permissible, we examine the constitutionality of the statute as it applies to

married parents whose fitness as parents is unchallenged.

 ▓▓▓▓ The parents initially asserted the unconstitutionality of T.C.A. § 36–6–301 (1985) under the Fourteenth Amendment to the United States Constitution. This Court has asked that the parties also address the constitutionality of the statute under the Tennessee Constitution, with particular reference to *Davis v. Davis*, 842 S.W.2d 588 (Tenn.1992), the case which acknowledged a right to privacy under the Tennessee Constitution. In light of this right to privacy, we believe that when no substantial harm threatens a child's welfare, the state lacks a sufficiently compelling justification for the infringement on the fundamental right of parents to raise their children as they see fit. Thus, we find the statute to be unconstitutional under Article I, Section 8 of the Tennessee Constitution, as applied to this married couple, whose fitness as parents is unchallenged. This result relieves us of the necessity of addressing the constitutionality of the statute under the federal constitution and, accordingly, we pretermit this issue.

In determining the validity of the statute, we look first to the nature of the right at stake. Tennessee law has long held that

> ... a parent is entitled to the custody, companionship, and care of the child, and should not be deprived thereof except by due process of law. It is a natural right, but not an inalienable one. The parents are trusted with the custody of the child upon the idea that under the instincts of parental devotion it is best for the child.

*State ex rel. Bethell v. Kilvington*, 100 Tenn. 227, 236, 45 S.W. 433, 435 (1898). This Court has further held that

therefore be "in the child's best interest." Some courts, viewing the question from the perspective of the grandparents rather than that of the child, have held otherwise. *See, e.g.,* the discussion of *King v. King*, 828 S.W.2d 630 (Ky.1992), *infra*. The United States Supreme Court was asked to review the *King* case on a right-to-privacy theory and declined. —— U.S. ——, 113 S.Ct. 378, 121 L.Ed.2d 289 (1992). The Supreme Court has never entertained a case involving the right to visitation of grandparents or other third parties.

2. Because of the petition filed by the grandparents in this case, the parents were required to come to court and expose what can only be described as the family's "dirty linen." Although they expressed little apparent hesitation in doing so, some parents might be uncomfortable exposing intimate reasons for their decision not to allow visitation, even though T.C.A. § 36–6–301(c)(2)(D)(i–ix) would permit the parents to raise as a defense the "implication" of a petitioning grandparent in acts against family members that would constitute rape, sexual battery, incest, or sexual exploitation.

[t]he relations which exist between parent and child are sacred ones.... The right to the society of the child exists in its parents; the right to rear it, to its custody, to its tutorage, the shaping of its destiny, and all of the consequences that naturally follow from the relationship are inherently in the natural parents, and they cannot be deprived of these rights without notice, and upon some ground which affects materially the future of the child.

*In re Knott,* 138 Tenn. 349, 355, 197 S.W. 1097, 1098 (1917). *Knott* thus upheld the custodial rights of a natural father who had not been proven unfit against prospective adoptive parents in far "better financial condition." *Id.* Hence, although this Court has not previously determined that the state constitution protects a parent's right to rear a child, the right has long been protected from state interference, except where the child's welfare is "materially" jeopardized.

Indeed, the right to rear one's children is so firmly rooted in our culture that the United States Supreme Court has held it to be a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution.[3] In *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), the United States Supreme Court held that

[w]hile this court has not attempted to define with exactness the liberty thus guaranteed [by the Fourteenth Amendment],.... [w]ithout doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.

The Supreme Court has reaffirmed this right on many occasions. In *Pierce v. Society of Sisters,* 268 U.S. 510, 534–5, 45 S.Ct. 571, 573–74, 69 L.Ed. 1070 (1925), the Court voided a law that prohibited parents from choosing private education over public schooling for their children, reasoning that the law would "unreasonably interfere[ ] with the liberty of parents ... to direct the upbringing and education of [their] children." Similarly, in *Wisconsin v. Yoder,* 406 U.S. 205, 207, 92 S.Ct. 1526, 1542, 32 L.Ed.2d 15 (1972), the Court upheld the right of Amish parents to withdraw their children from public schools after the eighth grade in order to educate them according to Amish beliefs. The Court found that "[t]he history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children." *Id.* at 232, 92 S.Ct. at 1541. The Court acknowledged that these rights are "subject to limitation ... if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens." *Id.* at 233–4, 92 S.Ct. at 1542. However, finding no such threat, the Court permitted the parent's choice, basing its holding on First Amendment protections and "the fundamental interest of parents, as contrasted with that of the State." *Id.* at 232, 92 S.Ct. at 1542. The right to rear one's child is, therefore, heavily protected by federal constitutional jurisprudence.

Although often expressed as a "liberty" interest, the protection of "childrearing autonomy"[4] reflects the Court's larger concern with privacy rights for the family. The Court in *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944), acknowledged the existence of a "private realm of family life which the state cannot enter." Protecting family privacy, the Court in *Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977), held unconstitutional a housing ordinance that limited the defini-

**3.** The Fourteenth Amendment states that "[n]o state shall ... deprive any person of life, liberty or property, without due process of law...."

**4.** Note, *The Constitutional Constraints on Grandparents' Visitation Statutes,* 86 Colum.L.Rev. 118, 126 (1986).

tion of a family. The Court upheld the family's right to define its members, insisting that "the Constitution protects the sanctity of the family...." *Id.* at 503, 97 S.Ct. at 1938. The Court referred not only to the line of cases such as *Meyer, Yoder,* and *Pierce,* that establish "traditional parental authority," but also to the "freedom of [procreational] choice" cases, such as *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965),[5] which establish "zones of privacy" based on the array of privacy protections in the Bill of Rights.[6] The Court's protection of parental rights thus evidences a deeper concern for the privacy rights inherent in the federal Constitution.

■ Tennessee's historically strong protection of parental rights and the reasoning of federal constitutional cases convince us that parental rights constitute a fundamental liberty interest under Article I, Section 8 of the Tennessee Constitution.[7] In *Davis v. Davis,* 842 S.W.2d 588 (1992), we recognized that although "[t]he right to privacy is not specifically mentioned in either the federal or the Tennessee state constitution, ... there can be little doubt about its grounding in the concept of liberty reflected in those two documents." *Id.* at 598. We explained that "the notion of individual liberty is ... deeply embedded in the Tennessee Constitution ...," and we explicitly found that "[t]he right to privacy, or personal autonomy ('the right to be let alone'), while not mentioned explicitly in our state constitution, is nevertheless reflected in several sections of the Tennessee Declaration of Rights...." *Id.* at 599–600. Citing a wealth of rights that protect personal privacy, rights such as the freedom

of worship, freedom of speech, freedom from unreasonable searches and seizures, and the regulation of the quartering of soldiers, we had "no hesitation in drawing the conclusion that there is a right of individual privacy guaranteed under and protected by the liberty clauses of the Tennessee Declaration of Rights." *Id.* Finding the right to procreational autonomy to be part of this right to privacy, we noted that the right to procreational autonomy is evidence by the same concepts that uphold "parental rights and responsibilities with respect to children." *Id.* at 601. Thus, we conclude that the same right to privacy espoused in *Davis* fully protects the right of parents to care for their children without unwarranted state intervention.

■ In this case, the paternal grandparents directly challenge this fundamental privacy interest by seeking court-ordered visitation. Bill and Sue Hawk argue that grandparent visitation is a "compelling state interest"[8] that warrants use of the state's *parens patriae* power to impose visitation in "best interests of the children." They insist that a judicially determined finding that visitation is in the best interests of the children is a sufficiently compelling[9] justification to override the parents' united opposition, regardless of the fact that the parents' fitness is not challenged and that the parents' domestic situation has never been the subject of judicial concern. We find, however, that without a substantial danger of harm to the child, a court may not constitutionally impose its own subjective notions of the "best interests of the child" when an intact, nuclear family with fit, married parents is involved.

5. *Id.* 381 U.S. at 500–1, 85 S.Ct. at 1690–91.

6. *Roe,* 410 U.S. at 152, 93 S.Ct. at 726.

7. This provision provides that "no man shall be ... deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

8. As *Roe v. Wade,* 410 U.S. 113, 155, 93 S.Ct. 705, 728, 35 L.Ed.2d 147 (1973), explained: "Where certain fundamental rights are involved

..., regulation limiting these rights may be justified only by a 'compelling state interest,' ... and ... legislative enactments must be narrowly drawn to express only the legitimate state interests at stake."

9. Tennessee law requires that the state's interest must be "sufficiently compelling" to overcome a fundamental constitutional right. *See Davis,* 842 S.W.2d at 602 (the state's interest in preserving a fetus is not sufficiently compelling until after the first trimester of pregnancy).

By holding that an initial showing of harm to a child is necessary before the state may intervene to determine the "best interests of the child," we approve the reasoning of both Tennessee and federal cases that have balanced various state interests against parental privacy rights. Implicit in Tennessee case and statutory law has always been the insistence that a child's welfare must be threatened before the state may intervene in parental decision-making. In a divorce case, for example, the harm from the discontinuity of the parents' relationship compels the court to determine child custody "as the welfare and interest of the child or children may demand...." T.C.A. § 36–6–101 (1991).[10] In child abuse and neglect proceedings the state seeks to prevent physical harm to the child. T.C.A. § 37–1–113—37–1–114 (1991). Moreover, in *Matter of Hamilton*, 657 S.W.2d 425 (Tenn.Ct.App.1983), the court declared a child "dependent and neglected" when her father refused cancer treatment for her on religious grounds. The *Hamilton* court held that "it is well-settled that the state as *parens patriae* has a special duty to protect minors and, if necessary, make vital decisions as to whether to submit a minor to necessary treatment where the condition is life-threatening...." *Id.* at 429. Tennessee law, thus, upholds the state's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child.

The federal cases that support the constitutional right to rear one's child and the right to family privacy also indicate that the state's power to interfere in the parent-child relationship is subject to a finding of harm to the child. In *Yoder*, for example, the United States Supreme Court deemed significant the fact that Amish children would not be harmed by receiving an Amish education rather than a public education. *Yoder*, 406 U.S. at 230, 92 S.Ct. at 1540. Likewise, in *Pierce*, the Court found that parents' decisions to send their children to private schools were "not inherently harmful," as there was "nothing in the ... records to indicate that [the private schools] have failed to discharge their obligations to patrons, students, or the state." *Pierce*, 268 U.S. at 534, 45 S.Ct. at 573. In *Meyer*, a case in which a teacher had been convicted of teaching a child German, the Court found that "proficiency in a foreign language ... is not injurious to the health, morals or understanding of the ordinary child," and thus the state's desire "to foster a homogeneous people with American ideals" was insufficient justification for forbidding foreign language instruction. 262 U.S. at 402–3, 43 S.Ct. at 628. In *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the Court required an individualized finding of parental neglect before stripping an unwed father of his parental rights. On the other hand, the Court upheld the conviction of a parent who allowed her child to sell religious magazines, approving state interference designed to prevent "psychological or physical injury" to the child. *See Prince v. Massachusetts*, 321 U.S. 158, 170, 64 S.Ct. 438, 444, 88 L.Ed. 645 (1944). Federal cases, therefore, clearly require that some harm threaten a child's welfare before the state may constitutionally interfere with a parent's right to rear his or her child.

The requirement of harm is the sole protection that parents have against pervasive state interference in the parenting process. As one author has stated:

> For the state to delegate to the parents the authority to raise the child as the parents see fit, except when the state thinks another choice would be better, is to give the parents no authority at all. 'You may do whatever you choose, so long as it is what I would choose also' does not constitute a delegation of authority.

---

10. Divorced parents may be less inclined to allow visitation with their former in-laws than married couples would be to grant grandparent visitation. Although we do not address the Grandparents Visitation Act as it applies to situations involving unmarried parents, we note that the state has a stronger argument for court intervention to protect the extended family when the nuclear family has been dissolved. Burns, *Grandparent Visitation Rights: Is it Time for the Pendulum to Fall?*, 25 J.Fam.L. 59, 79–80 (1991–2).

Bean, *Grandparent Visitation: Can the Parent Refuse?*, 24 U. Louisville J.Fam.L. 393, 441 (1985–6) [hereinafter Bean, *Grandparent Visitation* ]. In *Bennett v. Jeffreys*, 40 N.Y.2d 543, 387 N.Y.S.2d 821, 356 N.E.2d 277 (1976), the New York Court of Appeals emphasized that

> ... it is not within the power of a court, or, by delegation of the Legislature or court, a social agency, to make significant decisions concerning the custody of children, merely because it could make a better decision or disposition. The State is *parens patriae* and always has been, but it has not displaced the parent in right or responsibility. Indeed, the courts and the law would, under existing constitutional principles, be powerless to supplant parents *except for grievous cause or necessity.* * * * Examples of cause or necessity permitting displacement of or intrusion on parental control would be fault or omission by the parent seriously affecting the welfare of a child, the preservation of the child's freedom from serious physical harm, illness or death, or the child's right to an education, and the like....

*Id.* at 545–546, 387 N.Y.S.2d at 824, 356 N.E.2d at 281 (emphasis added).[11]

■ We, too, agree that neither the legislature nor a court may properly intervene in parenting decisions absent significant harm to the child from those decisions. In so holding, we approve the logic of *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), which applied a two-step process to child neglect cases leading to foster family placement. In *Santosky*, the Supreme Court approved New York's bifurcated proceeding requiring the state first to establish parental unfitness before placing a child in foster care. This procedure assures parents that a "best interests of the child" analysis will not pit them against potential foster parents;

rather, the state cannot consider a child's "best interests" until the natural parents have been declared unfit. *Id.* at 759–61, 102 S.Ct. at 1397–98. An approach requiring a court to make an initial finding of harm to the child before evaluating the "best interests of the child" works equally well in this case to prevent judicial second-guessing of parental decisions. As one scholar has written:

> If the courts attempt to resolve these disputes when the only thing at stake is a grandparent's argument that visitation is a 'better' decision for the child, the placement of the child with the parent becomes subject to the court's supervision and judgment of what are the best decisions for that child.

*See* Bean, *Grandparent Visitation, supra,* at 444–5.

■ By applying this type of analysis, we also seek to avoid the "unquestioning judicial assumption"[12] that grandparent-grandchild relationships always benefit children, an assumption that overlooks the necessity of a threshold finding of harm *before* the state can intervene in the parent-child relationship. For example, in *In re Robert D.*, 151 Cal.App.3d 391, 396–7, 198 Cal.Rptr. 801, 803–4 (1984), the California court gave nominal weight to the "right to parent [which] can only give way upon a clear and convincing showing of parental unfitness and detriment to the child," but then balanced this right against grandparent visitation which the court assumed was "beneficial for the child's development." Accepting a counselor's recommendation of grandparent visitation, the court disregarded the parents' concerns. *Id.* *Robert D.* illustrates how easily a court can deprive parents of fundamental rights when it contemplates the benefits of a grandparent-grandchild relationship, or any other perceived benefit, before assessing the need for state interference.

---

**11.** *Bennett* involved a 15–year–old mother who voluntarily gave custody of her child to her grandmother's friend and later sought the return of the child. Although the New York Court of Appeals reversed a decision giving the mother custody and remanded the case for rehearing, its opinion makes clear that a "best interests of

the child" analysis is only appropriate where the parent-child relationship has been damaged. *See also* Bean, *Grandparent Visitation, supra,* at 426.

**12.** Bean, *Grandparent Visitation, supra,* at 400–1.

This type of "result-oriented" analysis [13] is the basis of Justice Lambert's well-stated dissent in the recent Kentucky case, *King v. King*, 828 S.W.2d 630 (Ky.), *cert. denied*, —— U.S. ——, 113 S.Ct. 378, 121 L.Ed.2d 289 (1992). As in *Robert D.*, the *King* majority engaged in a sentimental reflection on the "special bond" between grandparent and grandchild. *Id.* at 632. Balanced against this presumed benefit, the court could find "no valid reason" for denying grandparent visitation. In his dissent, however, Justice Lambert disputed the constitutionality of a statute "which has as its only standard the subjective requirement of 'best interest of the child,'" adding that "mere improvement in quality of life is not a compelling state interest and is insufficient to justify invasion of constitutional rights." *Id.* at 633–4. He emphasized that the majority had ignored the requirement that harm be present before the state intervenes, but had instead made "the assumption that deprivation of access to the grandparent is harm," an assumption he characterized as having no authority and being "illogical." *Id.* at 635; *see also* Note, *The Constitutional Constraints on Grandparents' Visitation Statutes*, 86 Colum.L.Rev. 118, 134 (1986). Justice Lambert concluded:

> Absent a showing of harm to the child, there is no compelling state interest in intervention into the affairs of an autonomous family and any statute which authorizes such intervention violates the parents' liberty interest under the Fourteenth Amendment.

*King*, 828 S.W.2d at 635.

The trial court in this case engaged in the presumptive analysis we seek to avoid. Reflecting on his own relationship with his grandparents, the trial judge insisted that he, too, would sue for visitation rights if his children denied him access to his grandchildren. Giving lip service to "the natural parents' prerogative to ... raise their children in the manner in which they feel is best," he nevertheless established extensive visitation with the grandparents against the wishes of the parents. Without

finding that the parents were unfit or that a dissolving marriage between the parents had brought the matter of child custody before the court, the court imposed its own notion of the children's best interests over the shared opinion of these parents, stripping them of their right to control in parenting decisions.

 We hold that Article I, Section 8 of the Tennessee Constitution protects the privacy interest of these parents in their child-rearing decisions, so long as their decisions do not substantially endanger the welfare of their children. Absent some harm to the child, we find that the state lacks a sufficiently compelling justification for interfering with this fundamental right. When applied to married parents who have maintained continuous custody of their children and have acted as fit parents, we conclude that court interference pursuant to T.C.A. § 36–6–301 constitutes an unconstitutional invasion of privacy rights under the Tennessee Constitution. We therefore reverse both the judgment of the trial court and that of the Court of Appeals granting visitation in this case.

In addition to granting the grandparents visitation rights, the trial court found Bob Hawk in contempt of court for conspiring with his wife to remove their children from the court's jurisdiction. Bob Hawk testified at the contempt hearing that he and Bay discussed the option of Bay disappearing with the children and had agreed that if she disappeared, it would be better if he was unaware of their whereabouts. After his wife and children disappeared, Bob did not file a missing persons report or question relatives about his wife and children's location. The court concluded that Bob had conspired with his wife to evade the court's order and, consequently, ordered him to pay $25.00 a day until he returned his wife and children to the court's jurisdiction.

 T.C.A. § 29–9–102(3) prohibits "[t]he willful disobedience of any ... party ... to any lawful order...." It is also clear that

---

**13.** Bean, *Grandparent Visitation, supra*, at 403.

... a party cannot willfully disable himself from obeying an order of court and then set up his inability as a defense to a charge of contempt. When he has been found guilty, however, it is only when he has the present ability to perform that he can be committed until he does perform. * * * If he is wholly unable to perform, he can be punished only by fine not exceeding $50.00, or imprisonment for no more than 10 days, or both.

*Gossett v. Gossett,* 34 Tenn.App. 654, 658, 241 S.W.2d 934, 936 (1951); *see also* T.C.A. § 29–9–103. On appeal, we review punishments for contempt for "plain abuse of discretion." *Robinson v. Air Draulics Eng'r Co.,* 214 Tenn. 30, 37, 377 S.W.2d 908, 912 (1964).

■ The trial judge in this case obviously found that Bob Hawk had intentionally placed himself in a position in which he would be unable to comply with the court's visitation order. We find ample support in the record for this finding. Despite his conviction for contempt of court, however, there was no satisfactory evidence that Bob Hawk was thereafter able to procure his children's return to the court's jurisdiction. We find that under these circumstances, he cannot be sentenced for repeated offenses as the trial judge decided, but only for a single act of contempt. We, therefore, remand this part of the case to the trial court for resentencing.

Finally, Bob and Bay Hawk challenge the trial judge's failure to recuse himself. Because we hold unconstitutional the court's grant of visitation rights under the circumstances of this case and therefore reverse the trial court's judgment, we decline to address this issue.

Costs of this cause are taxed to the appellees.

REID, C.J., and DROWOTA, O'BRIEN and ANDERSON, JJ., concur.