# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### August 28, 2000 Session

## SHIRLEY WILLIAMS v. DONALD G. THRAILKILL

**A Direct Appeal from the Juvenile Court for Tipton County**
**No. J8063-8-587     The Honorable William A. Peeler, Judge**

---

### No. W1999-01032-COA-R3-CV - Filed October 23, 2000

---

This case involves visitation rights for an aunt of the minor child. In 1992, the aunt and her husband were granted visitation rights by the Shelby County Juvenile Court. In 1997, after the child's father had moved with the child to Tipton County, the aunt and her husband filed a petition in the Tipton County Juvenile Court to hold father in contempt for failing to abide by the visitation order, to change custody, and alternatively to enforce visitation. After an evidentiary hearing, the Tipton County Juvenile Court held that the prior Shelby County Juvenile Court order granting visitation to aunt was in full force and effect and incorporated the Shelby County order and its order by reference. Father has appealed.

### Tenn.R.App.P. 3; Appeal as of Right; Judgment of the Juvenile Court Vacated and Remanded

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

Harriet Thompson; Bolivar, For Appellant, Donald G. Thrailkill

T. D. Forrester; Covington, For Appellee, Shirley Williams

### OPINION

Respondent, Daniel G. Thrailkill (hereinafter Father), appeals the order of the Tipton County Juvenile Court enforcing a prior order of the Shelby County Juvenile Court granting visitation rights to petitioners, Joe Williams and Shirley Williams.[1]

Respondent's child, Daniel Thrailkill, was born on April 22, 1988. The events surrounding Daniel's birth are undeniably tragic. On May 9, 1988, Daniel's mother (Father's first wife), Pam Leonard, died from complications relating to Daniel's birth. Following his mother's death,

---

[1] Joe Williams died prior to the trial of the case.

Petitioners Shirley and Joe Williams, offered to care for Daniel. Father testified that he didn't know what to do with his son following his wife's death, so he accepted the Williamses' offer to care for Daniel. The Williamses brought Daniel home from the hospital following his mother's funeral and cared for him for the next eight years of his life.

During the time the Williamses cared for Daniel, Father admitted that he engaged in illegal behavior, culminating in misdemeanor charges for marijuana possession and solicitation of a prostitute in 1991. Father attended a drug and alcohol treatment program following the 1991 incidents and continued to attend group meetings for a year after he completed the treatment program. Father claims that he has not used drugs since 1992, and Petitioner presented no evidence to the contrary.

In 1991, the Williamses petitioned the Shelby County Juvenile Court to award them custody of Daniel.[2] On February 3, 1992, that court ordered that Father be granted legal and physical custody of Daniel. The decree also granted the Williamses visitation with Daniel on every other weekend during the school year and for two, two-week periods in the summer. After the 1992 order, Daniel lived with his father for a short time, then, with Father's permission, he returned to live with the Williamses.

In 1996, Father remarried. His wife, Karen Thrailkill, has a child from a previous marriage who is the same age as Daniel. Following the couple's marriage, Father brought Daniel to live with him and his new wife. In 1997, Ms. Thrailkill gave birth to Derek, Daniel's half-brother.

On May 29, 1997, Father and his family were living in Tipton County, and on that date the Williamses filed a Petition for Contempt and the Enforcement of Visitation in the Tipton County Juvenile Court, seeking to enforce the terms of the 1992 visitation order from Shelby County Juvenile Court. On June 19, 1997, the Tipton County Juvenile Court entered an interlocutory order that Father abide by the terms of the Shelby County order. On February 3, 1998, Respondent filed a counter-petition to terminate or modify the Shelby County 1992 visitation order. The case was tried on August 5, 1999, and on August 24, 1999, the court entered its order that the original order remained in full force and effect and incorporated the order by reference. Father appeals the juvenile court ruling.

The parties disagree as to the issues on appeal. Petitioner argues that the dispute over visitation in this case is an issue of *res judicata.* Father asserts that the trial court erred by failing to apply the decision in ***Hawk v. Hawk***, 855 S.W.2d 573 (Tenn. 1993), retroactively to this case. Although we address these concerns below, we believe the issue in this case is whether a court can enforce an order which grants visitation rights to a non-parent in the absence of any showing of substantial harm. We hold that there is no legal basis to enforce such an order.

_____

[2]The record in this case does not reflect what grounds the Williamses' petition alleged. For purposes of this opinion, we assume the petition alleged "dependant and neglected" grounds under Rule 8 of the Tennessee Rules of Juvenile Procedure.

The presumption of correctness applicable to a trial court's findings of fact pursuant to Tenn. R. App. P. 13(d) applies in child custody cases. *See Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984); *Whitaker*, 957 S.W.2d 834, 838 (Tenn. Ct. App. 1997). Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn.R.App.P. 13(d).

Tennessee has long recognized the rights of natural parents to raise their children without interference from the state. In *Hawk v. Hawk*, 855 S.W.2d 573 (Tenn. 1993), our Supreme Court reaffirmed Tennessee's strong commitment to protecting parental rights in holding that a parent's right to raise his or her child without state interference is subject only to a showing that the parent's decisions present a risk of substantial harm to the child. In holding that parental rights are a fundamental liberty interest under Article I, Section 8 of the Tennessee Constitution, the *Hawk* Court noted that "the right to rear one's children is so firmly rooted in our culture that the United States Supreme Court has held it to be a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution." *Id.* at 578.

Tennessee's commitment to parental rights is long-standing. Over one-hundred years ago, the Tennessee Supreme Court wrote that:

> [A] parent is entitled to the custody, companionship, and care of the child, and should not be deprived thereof except by due process of law. It is a natural right, but not an inalienable one. The parents are trusted with the custody of the child upon the idea that under the instincts of parental devotion it is best for the child.

*State ex rel. Bethell v. Kilvington*, 45 S.W. 433, 434 (Tenn. 1898). In a later case in which the natural father of a child challenged the child's adoption, the Court noted that:

> The relations which exist between the parent and child are sacred ones and have their foundation in nature, and the affection existing between them is stronger and more potent, and affords a greater protection to the child, than any relation which could be created by association merely. The right to the society of the child exists in its parents; the right to rear it, to its custody, to its tutorage, the shaping of its destiny, and all of the consequences that naturally follow from the relationship are inherently in the natural parents, and they cannot be deprived of these rights without notice, and upon some ground which affects materially the future of the child.

*In re Knott*, 197 S.W. 1097, (Tenn. 1917). This Court has recognized that the relationship between a parent and child "occupies a unique place in our legal culture," and that the fundamental interests natural parents have in their children "are more precious than property rights and more significant than the liberties derived from shifting economic arrangements." *Neely v. Neely*, 737 S.W.2d 539, 542 (Tenn. Ct. App. 1987).

Given Tennessee's historical protection of parental rights, as well as federal recognition of the fundamental right to privacy, we find it unnecessary to address the issue of whether the trial court should have applied the decision in **Hawk** retroactively. The law as it stood before **Hawk** is sufficient to support our holding in this case. We note that the **Hawk** decision itself supports this conclusion. In **Hawk**, our Supreme Court held that the Tennessee Constitution protects parents' "privacy interest . . . in their child-rearing decisions, so long as their decisions do not substantially endanger the welfare of their children." 855 S.W.2d at 582. The Court went on to say that, "although this Court has not previously determined that the state constitution protects a parent's right to rear a child, ***the right has long been protected from state interference, except where the child's welfare is 'materially' jeopardized***." **Id.** at 578 (emphasis added). It is this right which we seek to protect in the case at bar.

Under Tennessee law, therefore, the holding in this case turns on whether the original 1992 visitation order was based on any finding of substantial harm. We find no evidence in the record to indicate that it was. At no time in any of the proceedings involving the Williamses' visitation with Daniel did the Williamses present any evidence that Daniel's welfare would be materially jeopardized if the court failed to award visitation. Failure to make such a finding in an order granting custody of a child to a non-parent is an abridgment of a parent's fundamental right to privacy. ***See In re Askew,*** 993 S.W.2d 1, 5 (Tenn. 1999). Considering the parental rights guaranteed by Article I, Section 8, of the Tennessee Constitution, the same rule should apply to non-parental visitation.

Petitioner's contention is that the dispute between the parties to this action is *res judicata*, and that Respondent has the burden of showing a lack of substantial risk of harm to Daniel in order to terminate or modify the visitation order. We disagree. In ***In re Askew***, the Tennessee Supreme Court addressed this issue in the context of a custody dispute. ***See id.*** In that case, the Court held that the original order granting custody to the non-parent was invalid because it did not mention a basis for the grant of custody. ***See id.*** at 5. The Court went on to explain that, "[i]n the absence of such a valid initial order, we believe it would be unconstitutional for the natural mother to bear the burden of proving the absence of substantial harm." ***Id.***

This same reasoning shall apply to an order granting visitation to a non-parent. A court may not award a non-parent visitation unless the non-parent can show that denial of visitation presents a risk of substantial harm to the child. ***See Simmons v. Simmons***, 900 S.W.2d 682, 685 (Tenn. 1995). If an order granting visitation does not include a finding on the issue of substantial harm, that order is invalid. ***See In Re: Askew***, 993 S.W.2d at 4. This holding is consistent with well-established privacy rights under the Tennessee Constitution.

We have said that there is no end to the difficulties which arise when courts tell parents how to raise their children. ***See Neely***, 737 S.W.2d at 543. This case is a painful reminder of that truism. While the record does not indicate that Daniel is at risk of substantial harm if Ms. Williams' visitation ceases, it is important to note that the record does contain a recommendation by the court-appointed psychologist, Dr. John Hutson. Dr. Hutson writes that it is "clearly in Daniel's best

interest" to maintain a relationship with Ms. Williams, and that the parties should work together to "reduce the discord" in order to assist Daniel in eliminating his confusion as to "whom and what constitutes a mother for him." Daniel is indeed fortunate to have an aunt with such a magnitude of love and affection. Father should feel blessed that his son has such a devoted relative. For his son's sake, he should do everything in his power to foster and expand this relationship. If, as Dr. Hutson believes, the adults in this case are "genuinely interested in the best interest of Daniel," we would encourage them to work together in reaching an agreement which would best serve that interest.

The judgment of the trial court is vacated, and the case is remanded to the trial court for such further proceedings as may be necessary. Costs of the appeal are assessed against the petitioner, Shirley Williams.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S

.