IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 9, 2008 Session

## JACQUELINE HULS, ET AL. v. JASON N. ALFORD, ET AL.

**Appeal from the Chancery Court for Coffee County**
**No. 06-342     Allen W. Wallace, Senior Judge**

_____

**No. M2008-00408-COA-R3-CV - Filed October 22, 2008**

_____

This lawsuit was filed by Jacqueline and Jonathan Huls ("Petitioners") seeking court-ordered visitation with their grandson pursuant to Tennessee's Grandparent Visitation Act, Tenn. Code Ann. § 36-6-306. The lawsuit was filed against Jason Alford ("Father") and Leeanna Alford ("Mother"), the biological parents of Petitioners' grandson. At trial, both parents testified that they had not and still did not oppose visitation between Petitioners and Petitioners' grandson. Although comments made by the Trial Court support an implicit finding by the Trial Court that the parents did not oppose visitation, there was no express determination made on this particular issue. Following the trial, the Trial Court entered an order granting the petition and establishing a visitation schedule for Petitioners. We conclude that the testimony at trial preponderates in favor of a finding that the parents did not and do not oppose visitation. We further hold that in order for Tenn. Code Ann. § 36-6-306 to be implicated, visitation by grandparents must be "opposed by the custodial parent or parents." Tenn. Code Ann. § 36-6-306(a). Because we find that the parents do not oppose visitation, the statute is not implicated, and the Trial Court erred by not dismissing this case. We, therefore, reverse the judgment of the Trial Court, and this case is dismissed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the
Chancery Court Reversed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and SHARON G. LEE, SP. J., joined.

Jeffrey D. Ridner, Tullahoma, Tennessee, for the Appellants, Jason and Leeanna Alford.

Thompson G. Kirkpatrick, Manchester, Tennessee, for the Appellees, Jacqueline and Jonathan Huls.

Robert E. Cooper, Jr., Attorney General and Reporter, and Elizabeth C. Driver, Senior Counsel, for the Appellee, State of Tennessee.

# OPINION

## Background

Mother and Father were divorced in August of 2007, and they have one child, Joshua ("the Child"), who was born in November of 2004. Mother and Father submitted a parenting plan which was approved by the Trial Court, and they were granted a divorce based upon irreconcilable differences. In the parenting plan, Mother was designated as the Child's primary residential parent and Father's co-parenting time was set forth.

Approximately three weeks after Mother and Father were divorced, Mother's parents, Petitioners, filed a petition pursuant to the Grandparent Visitation Act seeking court ordered visitation with their grandson. Petitioners sued both Mother and Father.[1] Petitioners alleged:

> That the Respondents were divorced by decree of this Court on August 7, 2007 and a corresponding Parenting Plan between the parents [was] entered by this Court.
>
> That the minor child resided in the home of your Petitioners, along with the Respondent mother, for a period in excess of twelve (12) months from April 2005 until March 2007.
>
> That your Petitioners played an integral role in the childs (sic) life since birth and have performed many functions as a caretaker including but not limited to providing financial support, potty training the child, staying up at nights with the minor child, taking the minor child to doctor appointments, [and] cooking for and bathing the minor child.
>
> That without just cause and without any rational justification, the Respondent mother has attempted to sever this relationship and has refused to allow your Petitioners contact with or access to the minor child.
>
> That the child and your Petitioners have maintained a significant existing relationship for an excess of twelve (12) months preceding the severance of the relationship, and this relationship was severed by a parent or parents for reasons other than abuse or presence of a danger or substantial harm to the child, and the severance of this relationship is likely to cause substantial emotional harm to the minor child.

---

[1] Mother and Father will be referred to collectively as "Respondents" or "Parents."

Parents filed a motion to dismiss challenging the constitutionality of the Grandparent Visitation Act. Parents claimed that the provisions of Tenn. Code Ann. § 36-6-306 were in violation of the Tennessee State Constitution; specifically, Article I, Section 8. Parents asserted that the statute violated their constitutional right to the custody, care and control of the Child. The motion to dismiss also notified the Attorney General that the constitutionality of Tenn. Code Ann. § 36-6-306 was being called into question.

Following a hearing, the Trial Court entered an order concluding that the Grandparent Visitation Act did not impermissibly violate Parents' constitutional rights to the custody, care and control of the Child. According to the Trial Court:

> [T]he Court finds that Tenn. Code Ann. § 36-6-306 is constitutional under both the United States and Tennessee Constitutions.
>
> The United States Supreme Court, in addressing the issue of non-parental visitation statutes, has held that a statute which allowed any third party to petition for visitation at any time was facially constitutional. *Troxel v. Granville*, 120 S.Ct. 2054, 530 U.S. 57, 147 L.Ed.2d 49 (2000). Moreover, the Court refused to require a showing of harm to a child before a court could intrude into the sphere of family privacy and order visitation with a nonparent. *Troxel*, 120 S.Ct. at 2064. Because the Tennessee Supreme Court had previously ruled that such a showing of harm was required, *Hawk v. Hawk*, 855 S.W.2d 573, 575 (Tenn. 1993), the Tennessee Supreme Court has set a higher constitutional standard than that required by the United States Supreme Court in *Troxel*. Accordingly, Tenn. Code Ann. § 36-6-306 is constitutional under the United States Constitution.
>
> Under the Tennessee Constitution, the Tennessee Supreme Court has required an initial showing of danger of substantial harm to a child before the state may interfere in the form of court action to order grandparent visitation. *Hawk v. Hawk*, 855 S.W.2d 573, 577, 579-580 (Tenn. 1993). Because the current version of Tenn. Code Ann. § 36-6-306 requires a showing of harm before a court can order grandparent visitation, it fully comports with the requirements of *Hawk*, and is facially constitutional.
>
> Finally, [Parents] submit that Tenn. Code Ann. § 36-6-306 is unconstitutional as applied to them because it allows grandparents to petition for visitation when the parents of the child are divorced. However, the statute still requires that the grandparents prove a threat of harm to the child before a court can order grandparent visitation.

Accordingly, the statute does not treat married parents differently from divorced parents, and is constitutional as applied to [Parents].

Because the Trial Court determined that the statute was constitutional, a trial on the merits was necessary. The trial took place on January 8, 2008, with the first witness being Petitioner Jacqueline Huls ("Huls"). Huls testified that Mother and the Child lived with her from April of 2005 until March of 2007. Huls acknowledged that her relationship with Mother recently became strained because Mother believed Petitioners did not like Mother's new boyfriend, J.D. This occurred because Mother wanted Huls to let J.D. spend the night with Mother at Huls' house. Because Mother then was not yet divorced from Father, allowing J.D. to spend the night went against the legal advice of Mother's divorce attorney. Because Huls would not allow J.D. to spend the night, Mother began looking for another place to live and eventually moved out in March of 2007.

When asked if Mother had expressed concerns about Huls having overnight visitation, Huls stated:

> The last couple of conversations that we've had, the things that she says that she's upset with us about are we didn't listen and do things with [the Child] the way she wanted us to do it; we didn't put him to bed on time; he stayed up late a few nights; there was an issue about us going to Murfreesboro while she was at work and we weren't in town when she got off work.…

Huls testified that there also was friction between her and Father. At the beginning of the divorce proceedings, Huls would meet Father and take the Child to him so he could exercise his co-parenting time. Father apparently was to be taking medication and Huls did not have to turn the Child over to Father if he could not show documentation that he had taken the medication. One time Father refused to show Huls the required documentation, and Huls refused to let Father leave with the Child. The police were called and when Father showed the police documentation that he had taken his medicine, Father was allowed to leave with the Child. After that, it was decided that the exchange for visitation would take place at the police department. Unfortunately, there were two police departments. At the next exchange, Huls was at one police department, and Father was at the other. Mother informed Huls that Father was at the other police station, and Huls proceeded to take the Child to the police department where Father was waiting. Father commented to Huls that he would appreciate it if Huls would be on time in the future. Huls admitted that she said "F-U" to Father and walked off. Huls admitted saying "F-U" to Father more than once.

Huls testified that she filed the petition for grandparent visitation because she wanted to see the Child. When asked about Mother wanting Huls to see the Child on Mother's terms, Huls stated:

> [W]e called for a while every weekend. We'd say, "Can we get – You know, we'd like to see Josh this weekend." And every

-4-

single time her response was, "Can J.D. come too? Can J.D. come too?" I don't want to see J.D., I want to see [the Child]. My visitation with [the Child] should not have any bearing on what I feel about her boyfriend....

Huls was questioned further on cross-examination as to the contact she has had with the Child following Mother's divorce from Father. This testimony is as follows:

Q.      Now, isn't it true, in addition to cussing [Father] at the police station during these exchanges, that really your visitation with [the Child], you want it to be how you [and your husband] want it, right?

A.      I don't want it to be just the way we want it. I want to see [the Child]; I don't want to see J.D. every time I see [the Child]; and I don't think that we need supervised visitations to see [the Child].

Q.      Now, I've been coming up here several times and we've talked about the contact that you have had with him. You have been invited to have contact with [the Child], haven't you, ma'am?

A.      I have.

Q.      Matter fact, within just about a week after you filed this petition, your daughter called you and invited you and your husband over to a swim party where she and [J.D.] lived at the apartment, right?

A.      Yeah.

Q.      Y'all went to that, didn't you?

A.      We did.

Q.      Spent some time with your grandson, didn't you?

A.      We did.

Q.      Okay. After they finished swimming, [Mother] asked you to go up to – asked you and your husband up for lunch, didn't she?

A.      She did.

Q.    Invited you up to eat some pizza up in their apartment, didn't they –

A.    Uh-huh.

Q.    – to spend more time with your grandson?  Y'all didn't do that, did you?

A.    We did not.

                    *   *   *

Q.    Now, you were offered visitation within a week of filing this petition, some of which you exercised, some of which you didn't. Then a week after that, were [Mother's grandparents] down here visiting?

A.    They were.

Q.    And were they all invited over to dinner at [Mother's and J.D.'s] place?

A.    They were.

Q.    You didn't go?

A.    I did not.

Q.    In November you were invited to a birthday party?

A.    Uh-huh.

Q.    You went to that?

A.    I did.[2]

                    *   *   *

---

[2] During this testimony various comments were made by the attorneys, to which the Trial Court responded. Among other things, the Trial Court pointed out that : "[I]t seemed like the bottom line is nobody cares much about her having visitation, but it's the way you do it. . . . [W]hat I have got up to this point is that I – I don't see much objection to visitation but how you come about it.  That's what the issues seem like to me here."

Q. Would you agree with me, ma'am, and I won't go through each single one, but you would agree with me that there have been other times since the last one that I asked you about where you were invited to come and visit [the Child] at their place?

A. There were a couple of times….

Q. Okay. Did you go to either one of those?

A. No.

Father testified at trial that if Petitioners acted like adults, then it would be appropriate for them to have visits with the Child. Father stated that he had no problem with Petitioners exercising visitation but he does not believe it is appropriate for a court to intervene in decisions that he and Mother are responsible for making. Father stated that when he and Mother were divorcing, Petitioners acted "ugly" to him in front of the Child.

Father had been prescribed antidepressants by a physician at the VA hospital. The amount of medication Father was taking was phased down, and he currently is not taking any antidepressants. When asked about the situation where Huls was bringing the Child to Father and the police were called, Father stated that the police informed him that he could have Huls arrested for assault, but Father chose not to have her arrested. When Huls was informed that Father could press charges, Huls said, in front of the police officer and loud enough for the Child to hear, that she "will kick his fuc**ng ass." Father stated that on another occasion, Huls said "fu** you" and flipped him off.

Mother testified that she was 25 years old and was employed at the Manchester Coffee County Conference Center. Mother acknowledged that after she moved out of Petitioners' house, Huls would call asking to have visitation with the Child over the weekend. Mother stated that she worked during the week and often already had scheduled plans with the Child for the weekend. Mother then discussed the various times she tried to invite Petitioners over to spend time with the Child. She discussed the events described earlier in Huls' testimony, such as the birthday party, the swimming party, etc. Mother discussed the time when her grandparents were in town and she invited Petitioners over for dinner, but they declined the invitation. According to Mother, every time she talks to Petitioners about their visiting the Child, "[t]hey want to see [him] at their house by themselves and that's it, whichever time they choose, and it's usually on a Saturday…." Mother further testified as follows:

Q. [T]he times after you were served with this petition you weren't just dying to have your parents invited over to your place, were you?

A. Not necessarily, no.

-7-

Q. But you did it for your son, right?

A. I did.

Q. And you did that because you thought that that kind of contact would be in [the Child's] best interest, right?

A. I thought it would be good for all of us, yes.

Q. Okay. And you continued to do that the week after that, the next month, another time after that, and all the times that we have talked about, is that right?

A. Yes.

Q. And you think that opportunity – Would you continue to offer those opportunities?

A. I would. I would like to.

Q. And do you think that handling it in that fashion is in the best interest, where you do have some say in what goes on?

A. Yeah.

Mother also testified that she and J.D. are engaged and plan on getting married.

Following the trial, the Trial Court entered an order granting Petitioners' request for visitation. The Trial Court found that: (1) the Child resided with Petitioners for a period of twelve months or more and was removed from the home of Petitioners by Mother when she established her own residence; (2) the Child has a significant relationship with Petitioners and the loss of that relationship was likely to cause severe emotional harm to the Child; and (3) visitation with Petitioners was in the Child's best interest. After making these findings, the Trial Court entered a very liberal visitation schedule.

Parents appeal raising three issues, which we quote:

1. Whether the statutory provisions of Tenn. Code Ann. sec. 36-6-306 are an unconstitutional intrusion upon the rights afforded to [Parents] under Article I, Section 8 of the Tennessee Constitution and the Fourteenth Amendment to the United States Constitution?

2.     Whether a denial of visitation or severance of a relationship between the minor child and the grandparents occurred so as to implicate the provisions of Tenn. Code Ann. sec. 36-6-306?

3.     Whether the award of grandparent visitation was in the best interest of the minor child?

## Discussion

In *Smallwood v. Mann*, 205 S.W.3d 358 (Tenn. 2006), our Supreme Court discussed the standard of review in cases involving visitation, including grandparent visitation pursuant to Tenn. Code Ann. § 36-6-306. According to the Court:

> Appellate review of a visitation order is governed by an abuse of discretion standard, with the child's welfare given paramount consideration. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). Review of questions of law, including issues of statutory construction, is de novo with no presumption of correctness attached to the judgment of the trial court. *State v. Tait*, 114 S.W.3d 518, 521 (Tenn. 2003) (citing *Beare Co. v. Tenn. Dep't of Revenue*, 858 S.W.2d 906, 907 (Tenn. 1993); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993)).

*Smallwood*, 205 S.W.3d at 361.

In relevant part, the Grandparent Visitation Act, codified at Tenn. Code Ann. § 36-6-306, provides as follows:

> **Visitation Rights of grandparents. –** (a) Any of the following circumstances, when presented in a petition for grandparent visitation to the circuit, chancery, general sessions courts with domestic relations jurisdiction or juvenile court in matters involving children born out of wedlock of the county in which the petitioned child currently resides, necessitates a hearing if such grandparent visitation is opposed by the custodial parent or parents:
>
> *   *   *
>
> (6) The child and the grandparent maintained a significant existing relationship for a period of twelve (12) months or more immediately preceding severance of the relationship, this relationship was severed by the parent or parents for reasons other than abuse or

presence of a danger of substantial harm to the child, and severance of this relationship is likely to occasion substantial emotional harm to the child.

(b)(1) In considering a petition for grandparent visitation, the court shall first determine the presence of a danger of substantial harm to the child. Such finding of substantial harm may be based upon cessation of the relationship between an unmarried minor child and the child's grandparent if the court determines, upon proper proof, that:

(A) The child had such a significant existing relationship with the grandparent that loss of the relationship is likely to occasion severe emotional harm to the child;

(B) The grandparent functioned as a primary caregiver such that cessation of the relationship could interrupt provision of the daily needs of the child and thus occasion physical or emotional harm; or

(C) The child had a significant existing relationship with the grandparent and loss of the relationship presents the danger of other direct and substantial harm to the child.

(2) For purposes of this section, a grandparent shall be deemed to have a significant existing relationship with a grandchild if:

(A) The child resided with the grandparent for at least six (6) consecutive months;

(B) The grandparent was a full-time caretaker of the child for a period of not less than six (6) consecutive months; or

(C) The grandparent had frequent visitation with the child who is the subject of the suit for a period of not less than one (1) year.

(3) A grandparent is not required to present the testimony or affidavit of an expert witness in order to establish a significant existing relationship with a grandchild or that the loss of the relationship is likely to occasion severe emotional harm to the child.

Instead, the court shall consider whether the facts of the particular case would lead a reasonable person to believe that there is a significant existing relationship between the grandparent and grandchild or that the loss of the relationship is likely to occasion severe emotional harm to the child.

(c) Upon an initial finding of danger of substantial harm to the child, the court shall then determine whether grandparent visitation would be in the best interests of the child based upon the factors in § 36-6-307. Upon such determination, reasonable visitation may be ordered.…

Tenn. Code Ann. § 36-6-306 (Supp. 2008).

In *Smallwood*, *supra*, the Supreme Court discussed the important distinction between awarding a non-custodial parent visitation versus awarding a grandparent visitation. The Court stated:

Under section 36-6-301 of the Tennessee Code Annotated, barring the likelihood of endangerment to the child, a court is required to award visitation to a non-custodial parent: "After making an award of custody, the court shall, upon request of the non-custodial parent, grant such rights of visitation as will enable the child and the non-custodial parent to maintain a parent-child relationship...." In contrast, under the version of section 36-6-306 in effect at the time this visitation petition was filed in February of 2003 and under the current version of the statute, prior to granting a grandparent's request for visitation, a court must find "the presence of a danger of substantial harm to the child" *if such visitation is denied*, Tenn. Code Ann. § 36-6-306(b)(1) (2005), and determine whether such visitation would be in the "best interests" of the child, *id*. at (c). The reason for this distinction in visitation rights is well-established. Under both the United States and Tennessee Constitutions, parents have a fundamental right to the control and care of their children. *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Hawk v. Hawk*, 855 S.W.2d 573 (Tenn. 1993)). In custody disputes we have recognized that the natural parents' rights are superior to those of third parties unless the parent relinquishes his or her rights. *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Interference with this fundamental right is allowed only when there is a compelling state interest in doing so. *Nash-Putnam*, 921 S.W.2d at 174 (quoting *Nale v. Robertson*, 871

S.W.2d 674, 678 (Tenn. 1994)). Visitation rights arise from the right of custody and are controlled by the same constitutional protections. See George L. Blum, Annotation, *Grandparents' Visitation Rights Where Child's Parents Are Living*, 71 A.L.R.5th 99, 122 (1999). These constitutional protections are reflected in the statutes governing grandparents' visitation rights.

* * *

Allowing a grandparent to procure visitation without first requiring a showing of harm to the child *if such visitation is denied* not only violates section 36-6-306(b)(1) which specifically requires such a showing, it also constitutes an infringement on the fundamental rights of parents to raise their children as they see fit. *See Hawk*, 855 S.W.2d at 581.

*Smallwood*, 205 S.W.3d at 361-63 (footnotes omitted and emphasis added).

As set forth above, the very language of Tenn. Code Ann. § 36-6-306 is such that the statute is not implicated unless "visitation is opposed by the custodial parent or parents." As is clear from *Smallwood*, there cannot be "the presence of a danger of substantial harm to the child" as required by the statute unless visitation is denied. Without a denial of visitation, there simply cannot be any resulting "danger of substantial harm to the child." The term "opposed" includes situations both where visitation is denied totally and where visitation is technically not opposed, but where the frequency and/or conditions imposed by the parents on the visitation are such that it equates to a denial of visitation.

In the present case, the Trial Court never made a specific finding that either of the Parents were opposed to Petitioners having visitation with the Child. While the Trial Court did point out that Mother did not allow Petitioners visitation whenever they requested it, this does not amount to a finding that visitation was opposed or that Parents have attempted to sever the relationship between Petitioners and the Child. Indeed, the comments made by the Trial Court during the trial show an implicit finding by the Trial Court that visitation was not opposed by parents, and the true issue, in the Trial Court's view, was the amount of visitation and where it was to happen. *See supra* at n.2.

The undisputed testimony at trial by both Parents was that they did not oppose visitation. This conclusion is reinforced by Huls' testimony regarding the visitation that she and her husband did have as well as her admission that they chose not to exercise visitation at other times.

We conclude that the facts preponderate in favor of a finding that Parents do not and have not opposed visitation between Petitioners and the Child. Tenn. Code Ann. § 36-6-306 cannot be used by grandparents who think they are entitled to more or different visitation in the absence of

-12-

a finding that the parents actually or effectively "opposed" visitation. Because the facts preponderate in favor of a finding that Parents did not and do not oppose visitation, the petition should have been dismissed and the Trial Court erred when it entered an order establishing a specific visitation schedule. Accordingly, the judgment of the Trial Court is reversed, and this case is dismissed.

In light of our resolution of the above issue, the remaining two issues, including the constitutional challenge to the validity of Tenn. Code Ann. § 36-6-306, are necessarily pretermitted.[3]

## **Conclusion**

The judgment of the Trial Court is reversed, and this case is dismissed. This case is remanded to the Trial Court solely for collection of the costs below. Costs on appeal are taxed to the Appellees, Jacqueline and Jonathan Huls.

_____
D. MICHAEL SWINEY, JUDGE

---

[3] *See generally Henderson v. City of Chattanooga*, 133 S.W.3d 192, 215 (Tenn. Ct. App. 2003) ("our courts will not decide constitutional issues unless resolution is absolutely necessary for determination of the case and the rights of the parties.").