# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### January 2, 2001 Session

## STATE OF TENNESSEE, DEPARTMENT OF
## CHILDREN'S SERVICES v. PAMELA COX (GRAVES), ET AL.

**Appeal from the Circuit Court for Lawrence County**
**No. CC-58498     Robert L. Holloway, Jr., Judge**

---

**No. M1999-01598-COA-R3-CV - Filed July 17, 2001**

---

This case presents two issues. The first is whether proper notice was given to the mother of a dependent and neglected child to meet due process requirements and allow adjudication of her right to visitation and of the goal of the permanency plan for the child. The second issue is whether the evidence preponderated against the trial court's decision to change the goal of the permanency plan to termination of parental rights and terminate the mother's visitation. We affirm the circuit court on both issues finding no due process violation and more than adequate evidence to support the trial court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and PATRICIA J. COTTRELL, J., joined.

David Kozlowski, Columbia, Tennessee, for the appellant, Pamela Cox (Graves).

Paul G. Summers, Attorney General and Reporter and Douglas Earl Dimond, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee, Department of Children's Services.

## OPINION

The child at issue in this matter, Pamela Cox, was removed from the custody of her parents on October 4, 1995 when she was approximately five months old. Following an adjudicatory hearing on March 13, 1996, the Juvenile Court entered an order finding Pamela dependent and neglected as to her mother and a victim of severe child abuse by her father. Pamela's father, Robert Cox, has not entered an appearance in this matter and has not joined in this appeal. The April 10 order awarded temporary legal and physical custody of Pamela to the State of Tennessee, Department of Children's

Services and granted the child's mother, Pamela Cox (Graves) (hereinafter "Ms. Graves"), two hours supervised visitation each week with Pamela[1], every other visit to be held at the mother's home.[2]

Due to circumstances surrounding Ms. Graves' home life after she began living with her current boyfriend, the case worker for the Department of Children's Services, hereinafter "DCS", stopped visitation at Ms. Graves' home. On May 22, 1998, Ms. Graves filed a Petition to Modify Orders alleging that DCS was not allowing visitation in her home as required by the April 10, 1996 order and further requesting expanded visitation rights. Prior to a hearing, the parties met and agreed to a temporary disposition of the matter. The temporary agreement memorialized in the Juvenile Court's order of July 21, 1998 provided for expanded visitation to four hours per week with the visits to be conducted at Ms. Graves' home or a site away from the DCS office. Visits would continue to be supervised. The court also ordered a staffing to be held at DCS on July 2, 1998 and scheduled a permanency planning hearing for July 22, 1998 pursuant to Tennessee Code Annotated section 37-2-409.

This permanency planning hearing was held as scheduled on July 22, 1998. No transcript exists of the juvenile court hearing; however, in a letter of July 28, 1998 to counsel, the court set out its decision.

On July 22nd, 1998 this case came to be tried on behalf of the state asking this Court to approve a plan of care on behalf of the minor child Pamela Cox. This minor came into State custody in October of 1995. The minors' [sic] date of birth is May 14, 1995.

The reason this child was placed in custody was because of abuse on behalf of its Father and neglect on behalf of its Mother failing to protect it.

The Court makes the following findings: This Child was abused when it was a tiny infant and apparently the Mother of this Child turned a blind eye to the abuse this child was subjected to by its Father.

This Child has been in state custody for 2 ½ years and the Department of Human Services has attempted and made reasonable efforts to return this Child to its natural Mother, who has now divorced the Childs' [sic] Father. However, the Mother repeatedly evidenced an unwillingness to follow a plan visitation even though she was unemployed, she would cancel scheduled visits with this Child. These scheduled visits were extremely important because they coincided with a time when a trained parenting counselor would be present (Ms. Williams with Kings Daughter

---

[1] The child in this matter and her mother had the same name, Pamela Cox. However, her mother took back her maiden name of Graves after divorcing the child's father.

[2] At the time of the 1996 hearing, Ms. Graves was living with her mother, Barbara Graves.

Program).  The Mother has failed to contribute any support for this child even though she is a recipient of SSI benefits in the amount of $400.00 monthly.

The Mother and her live-in boyfriend have less than a stable environment, domestic violence being present in the home, and her live-in boyfriend will not participate in any counseling dealing with issues of parenting or domestic violence.

The Mother never attended any parenting counseling even though it was scheduled by Department of Human Services and would have been at no cost to her.

The Father of this child has not visited, supported, or even shown any interest in this child since the minor was placed in protective custody.

Therefore this Court concludes it would be a high risk of irretrievable harm to ever attempt to place this child in the home of the parent, a goal that cannot be accomplished.  To delay the inevitable any longer is a detriment to the health, safety, and normal development of this young child.  It is therefore Ordered that that the plan of care be modified as follows:

> (1) The child will remain in foster care in the Wood[w]ard household.

> (2) Visitation between this Child, and either parent is terminated.  The State is Ordered to move to terminate the parental rights of both parents.

On November 2, 1998, Ms. Graves appealed the juvenile court order and this matter was tried *de novo* before the circuit court on May 11, 1999.  Following this hearing, the circuit court found,

> that the Juvenile court was within its jurisdiction to terminate visitation, *sua sponte*, between the child and either parent.  Thereby, the Honorable Lee England's, Juvenile Court Judge, ruling on July 22, 1998 was upheld and determined to be in the best interest of the child and the public.  Further, Pamela Cox Graves['] motion to reinstate visitation with her daughter is denied upon a finding of substantial risk of harm to the child due to the mother's unstable lifestyle and exposure to physical, sexual, and emotional abuse.

This appeal subsequently ensued.  However, as of the date of this appeal, no petition for termination of parental rights had been filed.

## I.

The first issue presented for review is whether Ms. Graves was afforded prior notice and opportunity to be heard on the issues of termination of her visitation and changes in Pamela's

permanency plan, which were decided by the juvenile court. We find that Ms. Graves had adequate notice and the opportunity to be heard, not only once but twice, on these issues; as such, this case does not present a due process violation.

Defendant herself requested a review of the visitation issue. Although she only requested expanded visitation or strict enforcement of the previously granted visitation, the court, after reviewing the pleadings, determined that a permanency planning hearing should be scheduled pursuant to Tennessee Code Annotated section 37-2-409(1996). With regard to these periodic hearings the Code provided:

> (a) In addition to the other requirements of this part, the judge or referee shall hold a hearing within eighteen (18) months of the date of foster care placement for each child in foster care. As long as a child remains in foster care, subsequent dispositional hearings conducted pursuant to subsection (b) shall be held no less frequently than every twelve (12) months for each child, or as otherwise required by federal regulations.

> (b)(1) The purpose of these dispositional hearings shall be to determine the future status of the child, including, but not limited to, whether the child should be returned to the parent, should be continued in foster care for a specific period, should be placed for adoption, or should, because of the child's special needs or circumstances, be continued in foster care on a permanent or long term basis, and shall determine the extent of compliance of all parties with the terms of the permanency plan, and the extent of progress in achieving the goal of the plan.

Tenn. Code Ann. § 37-2-409(a), (b)(1)(1996). This law provided adequate notice that all issues regarding the future status of the child were in front of the court, including whether the goal of the permanency plan should be changed and what steps should be taken in furtherance of that goal.

Once a child is determined to be dependent and neglected, removed from its family, and placed in foster care, Tennessee law sets out primary goals of determining the best interest of the child and placing the child in a permanent stable home at the earliest possible date.

> (a) The primary purpose of this part is protect children from unnecessary separation from parents who will give them good homes and loving care, to protect them from needless prolonged placement in foster care and the uncertainty it provides, and to provide them a reasonable assurance that, if an early return to the care of their parents is not possible, they will be placed in a permanent home at an early date.

> (b) The secondary purpose of this part is to provide a mechanism to monitor the care of children in foster care to insure that everything reasonably possible is being done to achieve a permanent plan for the child.

(c) . . . When the interest of a child and those of an adult are in conflict, such conflict is to be resolved in favor a child, and to those ends this part shall be liberally construed.

Tenn. Code Ann. § 37-2-401 (1996).

In determining whether the court's notice that it would hold a permanency planning hearing was sufficient to provide Ms. Graves with due process, we look to the Tennessee Supreme Court for the requirements of due process.

A fundamental requirement of due process is notice and an opportunity to be heard. *Mullane v. Central Hanover Bank & Trust Co.* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *In Re Riggs*, 612 S.W.2d 461, 465 (Tenn.App. 1980). The purpose of notice is to allow the affected party to marshal a case . . . .

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). In determining what process is due in a particular situation, three factors must be considered: (1) the private interest affected by the official action; (2) the risk of erroneous deprivation of the interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and finally, (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). Moreover, the component parts of the process are designed to reach a substantively correct result. Elaborate procedures at one stage may compensate for deficiencies at other stages. *Bignall*, 538 F.2d at 246.

*Phillips v. State Bd. of Regents*, 863 S.W.2d 45, 50 (Tenn. 1993). The Code set out specifically what issues were before the court during a periodic permanency planning hearing and afforded the parents the opportunity to come before the judge with counsel to defend their rights and record with regard to their child.

When we look at the authority and obligation of the court to periodically review and determine the status of the child in light of the legislature's intent to give dependent and neglected children permanent and stable homes, it is evident that the juvenile court had the authority to review Pamela's status and create a permanent plan for her that was in her best interest, offering her the opportunity for a permanent stable home. It was obvious to the juvenile court that placing Pamela back with either parent would not be possible; thus, the judge determined that a change in the goal of the permanency plan was in order. In furtherance of that goal, and in the best interests of Pamela due to a threat of substantial harm, the juvenile court ordered a termination of visitation.

However, even if the juvenile court's notice of a permanency planning hearing had provided inadequate notice of what issues would be before that court, the system provided Ms. Graves with a second opportunity for a full, *de novo*, hearing. This matter was retried in the Circuit Court for Lawrence County.

> The Due Process Clause requires the provision of a hearing "at a meaningful time." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. at 547, 105 S.Ct. at 1496. A post-decision hearing will suffice as long as it is held within a reasonable time in light of the issues and interests at stake. Although a post-decision hearing is often sufficient, the promptness in which one is held is of constitutional concern. Even though there is a point at which an unjustified delay in completing a post-deprivation proceeding would become a constitutional violation, the significance of such a delay cannot be evaluated in a vacuum. No precise rules exist to determine whether a delay in holding a hearing rises to the level of a constitutional problem. Rather, the importance of the private interest and the harm to this interest occasioned by the delay; the government's interest and its reason for the delay; and the likelihood that the pre-hearing decision is erroneous are examined and weighed against each other.

*State v. AAA Aaron's Action Agency Bail Bonds, Inc.*, 993 S.W.2d 81, 86 (Tenn.Crim.App. 1998) (citations omitted). There has been no argument that Ms. Graves was unaware of what issues before the circuit court and we find the ten month delay for review reasonable in light of the nature of the deprivation and the likelihood that the juvenile court's decision was erroneous. As such, the statutory notice of what issues are raised by a periodic review and the opportunity for *de novo* review of the juvenile court's decision by the circuit court provided a full and adequate notice of and opportunity to be heard on all issues before the court.

II.

The second issue presented is whether the circuit court properly terminated Ms. Graves' visitation with her daughter. We find that the evidence does not preponderate against the circuit court's determination that continued visitation posed a substantial risk of harm to the child and that termination was in Pamela's best interests. At the circuit court trial, DHS called numerous witnesses who testified to Ms. Graves' lack of progress in rectifying the conditions which caused Pamela to be removed from her parents including Ms. Graves' lack of parenting skills and her continual voluntary subjection to physical and sexual abuse.

Bridget Massey, the DHS worker who handled Pamela's case from her removal in October of 1995 through March of 1996, set up a plan of care which involved Ms. Graves obtaining counseling and attending parenting classes. She was also to obtain employment. Ms. Graves failed to comply with this plan of care. She did not obtain employment and did not attend parenting classes or any counseling regarding her domestic violence issues.

During this period Ms. Graves moved in with a Mr. Charles Smithson and subjected herself to continual domestic violence at his hand. Ms. Massey also testified to further abuse of Pamela by Ms. Graves. Visitation, which had previously taken place at the home of Ms. Graves' mother, was changed due to this incident of abuse wherein Pamela was returned from visitation with injuries to her bottom. Ms. Graves was charged with child abuse following that incident.

From March of 1996 until August of 1996 Pamela's case was handled by Jan Hill. Ms. Hill testified to developing a second plan of care that contained the same responsibilities initially determined by Ms. Massey to be necessary for reunification to occur. These responsibilities included continued visitation with the child, counseling, a stable home life, employment, and parenting classes.

During Ms. Hill's period of work with this case, Ms. Graves demonstrated an inability to properly care for Pamela. She would overfeed Pamela until she threw up. She would also feed her inappropriate foods for a child her age including french fries, Coke and large amounts of chocolate and cookies. She further demonstrated bizarre behavior in interacting with the child, changing the child's clothes numerous times during a two hour visit.

Ms. Hill testified that Ms. Graves informed her of domestic violence occurring at the hand of Mr. Smithson, with whom she was living. Ms. Graves was forced to obtain a restraining order against Mr. Smithson during several periods and admitted to Ms. Hill that she feared for her life. Ms. Hill provided a 'diary', which was admitted into evidence and which was given to her by Ms. Graves. This diary contained Ms. Graves' harrowing account of seven days of physical and sexual abuse beginning on approximately April 27, 1996. When Ms. Hill began working with Pamela's case, DHS attempted visitation at the home of Ms. Graves and Mr. Smithson; however, the domestic violence prohibited continued visits in the home and DHS changed all visitation to their office. Ms. Hill further testified that, during the visits at Ms. Graves and Mr. Smithson's home, there was a video camera set up in the home which appeared to make Ms. Graves extremely nervous.

Tracy Oden of the Lawrenceburg Police Department testified to a domestic abuse complaint received from Ms. Graves on January 19, 1997. Ms. Oden took a statement from Ms. Graves wherein Ms. Graves stated that she had been struck by Mr. Smithson in the ribs with his fist and had been whipped with a belt across the back and choked. Photos were taken of the bruises and marks left by this abuse. Ms. Oden proceeded to the home of Mr. Smithson to arrest him for this abuse and found him passed out on the couch with a loaded gun in his hand and one on his waist. He also had 75 to 100 rounds of ammunition in a stack near where he had passed out.

The next case manager to handle Pamela's case was Jenny Horton. The plan of care devised by Ms. Horton contained the same elements as the previous plans of care. Ms. Horton testified that, during her year of work with Pamela, Ms. Graves did not comply with the plan of care and her circumstances did not change. She testified that visits were conducted at the DHS office when she began working on the case due to the domestic violence issues. However, a large number of the

scheduled visits were cancelled.  During those which Ms. Graves attended, she would often lose interest in Pamela prior to the end of the visit.

Eventually visits resumed at Ms. Graves' home; however, Ms. Horton also testified to the bizarre home life which included a video camera set up in the home and Ms. Graves showing her an album that contained pictures of Ms. Graves clothed in a see-through nightgown as well as pictures of Mr. Smithson clothed in the same nightgown.  Ms. Horton also testified to Ms. Graves' continued inability to properly care for her child.  Problems with overfeeding and vomiting continued.  She further demonstrated lack of concern for Pamela by scaring her with a bird and then abusing the bird in front of the child.

Although Ms. Graves was allowed to have longer visits with Pamela and was allowed visits supervised by family members during her time with this case, Ms. Horton did not feel that Pamela would be safe if returned to her mother.  She felt that Ms. Graves did not make an effort to comply with the plan of care nor did she make any effort to assist Nancy Williams, the state worker tutoring and counseling Pamela.

Ms. Williams, an early intervention worker, testified that Pamela had motor and language delays which she felt were caused by environmental conditions prior to her being taken from her parents.  She also testified to Pamela making great gains in foster care, to the point intervention was no longer needed.

On August 9, 1998, Ms. Graves made another call to the police department for domestic abuse.  Patrolman David Moore was called to the scene and testified at the trial regarding this incident.  Mr. Smithson had assaulted Ms. Graves and she informed Officer Moore that she intended to leave Mr. Smithson.  Officer Moore waited while Ms. Graves obtained some of her things.  She left with him in the police car.  However, Ms. Graves failed to file any charges against Mr. Smithson and returned to his home within 24 hours.

Pamela's first foster parent, Ms. Julie Parker, testified to some of the bizarre behavior and lack of parenting skills witnessed to by the DCS workers.  She saw injuries to Ms. Graves including black eyes on several occasions.  During visitation, when she took Pamela to Ms. Graves' house, she testified to seeing the video camera set up in the home and being shown the pictures of Ms. Graves and Mr. Smithson in the see-through nightie.  She also testified to Ms. Graves' poor parenting skills including overfeeding Pamela till she threw up and purchasing clothes inappropriately sized for her.

Ms. Parker had custody of Pamela at the time of the incident of abuse at Ms. Graves' mother's house when Pamela was approximately six months old.  She stated that Ms. Graves' mother was supposed to be supervising the visit and telephoned her very upset stating that her daughter had tried to leave with Pamela.  When Pamela was returned to Ms. Parker, the inside of her bottom was black.  The doctor who treated Pamela informed Ms. Parker that she had been slammed in the bottom.  She was later told by Ms. Graves' mother that Pamela had been slammed into the car seat by Ms. Graves when she attempted to leave with the child.

The last case manager to handle Pamela's case was Catherine Bryant. When Ms. Bryant first took over managing Pamela's case the goal was reunification. Her plan was virtually the same as previous plans and included counseling, parenting classes, the need for a job and a stable home environment. She supervised 3 visits prior to termination of Ms. Graves' visitation and testified to seeing the video camera at the home of Ms. Graves and Mr. Smithson. However, Ms. Bryant was only able to interact with Ms. Graves for less than two months, as she took over the case on June 1, 1998 and termination of Ms. Graves' visitation followed the permanency planning hearing in July 1998. After this hearing, the plan's goal was changed to termination of parental rights and visitation ceased.

Ms. Bryant also testified to the last foster care review which was held in November of 1998. At that time, the foster care review board determined that reunification was not appropriate and recommended termination of parental rights and adoption.

Ms. Graves' mother, Barbara Graves, expressed her concern over her daughter's domestic violence situation and recounted the incident of child abuse which occurred at her home. Ms. Graves' mother stated that she had offered to let Ms. Graves live with her on many occasions, but she had refused to leave Mr. Smithson. Although Ms. Graves has "left" him on two or three occasions after domestic violence incidents, she never stayed with her mother more than one day and always returned to the home of Mr. Smithson.

Pamela has been in foster care with Martha Woodward since April 11, 1993. Ms. Woodward testified that Pamela had nightmares after visits with her mother and that these nightmares stopped after visits with her mother ceased. She, along with Janice Myers from Child Protective Services, also testified to another incident of possible child abuse. This occurred on approximately March 26, 1998. Pamela was returned to her foster mother after visitation with an injury to her left shoulder. When questioned by Ms. Woodward and Ms. Myers, Pamela stated that "Mama Cox hit" her. She was told by a physician that Pamela had been jerked by the arm.

Ms. Graves, Pamela's mother, also testified at the hearing. She stated that she did not know anything about the shoulder injury, but she had previously pled guilty to the child abuse when she threw Pamela into the car seat. She had finally completed parenting classes in April 1999. Her testimony was that Mr. Smithson was not abusive, although he had been in the past. She stated that Mr. Smithson had ceased any abusive activity and that she did not want to live with her mother, Barbara Graves, because they "did not get along".

After hearing all of this evidence, the circuit court found that visitation was properly terminated considering the mother's history of violence, her denial of this violence, as well as her lack of parenting skills. The court found that visitation posed a substantial risk of harm to the child due to the mother's unstable lifestyle and exposure to physical, sexual, and emotional abuse. The DCS was ordered to file a petition for termination of parental rights as soon as possible.

Our standard of review in this matter is "*de novo* upon the record of the trial court accompanied by a presumption of correctness of the finding, unless the preponderance of the evidence is otherwise." *State v. Conatser*, 1990 WL 15540 at * 3 (Tenn.Ct.App.); *see also Hass v. Knighton*, 676 S.W.2d 554 (Tenn. 1984). The facts as presented at the trial of this matter do not preponderate against the circuit court's finding that Ms. Graves' visitation posed a substantial threat of harm to Pamela and that termination of visitation was in her best interests.

Two supreme court cases make clear the standards under which juvenile courts must operate when dealing with dependent and neglected children. Although parents' have a right to raise, care for and have the companionship of their child under both Tennessee and U. S. Constitutions, these rights can be infringed upon if the court finds substantial harm threatens a child's welfare.

> Tennessee courts have historically held that,

> a parent is entitled to the custody, companionship, and care of the child, and should not be deprived thereof except by due process of law. It is a natural right, but not an inalienable one. The parents are trusted with the custody of the child upon the idea that under the instincts of parental devotion it is best for the child.

> *Hawk v. Hawk*, 855 573, 577 (Tenn. 1993) (quoting *State ex rel. Bethell v. Kilvington*, 100 Tenn. 227, 236, 45 S.W. 433, 435 (1898)). In *Nale v. Robertson*, 871 S.W.2d 674, 680 (Tenn. 1994), the Court stated:

> This Court found in *Davis v. Davis*, 842 S.W.2d 588, 600 (Tenn. 1992), that "there is a right of individual privacy guaranteed under and protected by the liberty clauses of the Tennessee Declaration of Rights." This constitutional right of privacy includes parental rights.

>> In light of this right to privacy, we believe that when no substantial harm threatens a child's welfare, the state lacks a sufficiently compelling justification for the infringement on the fundamental right of parents to raise their children as they see fit.

> *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993); *see also Broadwell v. Holmes*, 871 S.W.2d 471 (Tenn. 1994).

Therefore, in a contest between a parent and a non-parent, a parent cannot be deprived of the custody of a child unless there has been a finding, after notice required by due process, of substantial harm to the child. Only then may a court engage in a general "best interest of the child" evaluation in making a determination of custody.

*In re: Adoption of Female Child,* 896 S.W.2d 546, 547-48 (Tenn. 1995).

In 1993, the Tennessee Supreme Court approved a two step process to deal with child neglect cases leading to placement in foster care.

> We, too, agree that neither the legislature nor a court may properly intervene in parenting decisions absent significant harm to the child from those decisions. In so holding, we approve the logic of *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), which applied a two-step process to child neglect cases leading to foster family placement. In *Santosky*, the Supreme Court approved New York's bifurcated proceeding requiring the state first to establish parental unfitness before placing a child in foster care. This procedure assures parents that a "best interests of the child" analysis will not pit them against potential foster parents; rather, the state cannot consider a child's "best interests" until the natural parents have been declared unfit. *Id.* at 759-61, 102 S.Ct. at 1397-98. An approach requiring a court to make an initial finding of harm to the child before evaluating the "best interests of the child" works equally well in this case to prevent judicial second-guessing of parental decisions.

*Hawk*, 855 S.W.2d at 581.

The court made clear that there must be a threshold finding of harm before the state can intervene in a parent-child relationship; however, once this finding of harm to the child is made, a determination of custody is made based on the "best interest of the child". This threshold finding of substantial harm was made when Pamela was found by the juvenile court to be abused, dependent, and neglected and removed form the custody of her parents and placed in foster care.

Under Tennessee's statutory scheme, once a child is placed in the foster care system the court must conduct periodic reviews to continually determine the child's best interests, setting out future goals for providing the child with a permanent home and determining how those goals can best be accomplished. It was determined by the judge that the best interest of the child would be served by changing the goal of Pamela's permanency plan to adoption rather than reunification, as reunification was an impossibility. The circuit court further determined that visitation would pose a substantial risk of harm to Pamela due to her mother's continued subjection to physical, sexual and emotional abuse, her mother's denial of this abuse, as well as her unstable and erratic lifestyle. The evidence provided proof of Ms. Graves' lack of progress in over four years and of her continued subjection to, and denial of, abuse. This evidence does not preponderate against the circuit court's decision to change the goal of the permanency plan and terminate visitation. However, at this time her parental rights have not been terminated, so once a petition for termination of parental rights is filed, Ms. Graves will have the opportunity to address that issue. The circuit court's decision is affirmed.

———————————————————
WILLIAM B. CAIN, JUDGE