IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 3, 2003 Session

## ALICE HALE v. WAYNE CULPEPPER

Appeal from the Circuit Court for Coffee County
No. 30713     L. Craig Johnson, Judge

No. M2002-01955-COA-R3-CV - Filed December 22, 2003

Following the death of a child's mother, the maternal grandmother filed a petition to establish grandparent visitation with her grandson. After a hearing where the trial court heard testimony and after an independent psychological report, the trial court awarded visitation to the grandmother. The father appeals, arguing that the evidence preponderates against the trial court's decision. Because the record contains no evidence of danger of substantial harm to the child, we reverse the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Reversed and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM B. CAIN, J. and James L. Weatherford, Sr. J., joined.

Robert T. Carter, Tullahoma, Tennessee, for the appellant, Wayne Culpepper.

H. Thomas Parsons, Manchester, Tennessee, for the appellee, Alice Hale.

### OPINION

#### I.

This appeal arises as a result of the trial court's decision to award grandparent's visitation to Alice Hale. Wayne Culpepper, father of the child, appeals the grant of visitation to Ms. Hale.

Mr. Culpepper and his wife Tonya had a child in 1994. Tragically, in May of 2000, Mrs. Culpepper took her own life. Ms. Hale, Tonya's mother, filed a petition several months after her daughter's death to establish grandparent visitation.

The only testimony in the case was taken by the trial court shortly after the petition was filed in December of 2000. We do not have a transcript of those proceedings, but the Statement of the Evidence, submitted accordance with Tenn R. App. P. 24, summarizes the testimony as follows.

Ms. Hale testified that at the time of her daughter's death, she felt that Mr. Culpepper was responsible in some way. She accused Mr. Culpepper of being responsible for Tonya's death and even got visibly disruptive at the funeral.[1] After reflecting on her actions, Ms. Hale testified that she no longer blames Mr. Culpepper for her daughter's death.

Ms. Hale testified that she had a significant existing relationship with her grandson and that prior to her daughter's death, she spent significant amounts of time with her grandson; she said that he spent the night at her house about once a week. Mr. Culpepper only remembers one instance during an ice storm that his wife and son spent the night at Ms. Hale's home, but conceded that it may have occurred on more occasions when he was out of town on business. He also testified that he did not ever remember his son spending time alone with his grandmother prior to his wife's death.

Mr. Culpepper testified that aside from typical marital problems, he and Tonya Culpepper suffered from nothing unusual during their marriage. He did, however, acknowledge his wife's extreme depression. He was the first person to discover his wife's body after her suicide; immediately, Ms. Hale went to the Culpepper residence and accused Mr. Culpepper of murdering his wife. She stated, "I know what happened, you will not get away with this." Mr. Culpepper remembered that Ms. Hale was disruptive at the funeral and the grave side service in front of her grandson.

Since his wife's death, Mr. Culpepper and his son have moved in with his parents. He stated that he made a decision as a parent at the time of his wife's death to protect his son by keeping him away from Ms. Hale and that side of the family. He did acknowledge, however, that it is likely that Ms. Hale had calmed down since the funeral. He testified that his son is well adjusted and has done well in school since his mother's death.

The final witness to testify at the hearing was Dr. Bethany Lohr, a child psychologist who knew Mr. Culpepper and his son. Although she had never seen the child in a clinical setting, Dr. Lohr testified that in her professional opinion the child would not suffer "any irremediable or substantial harm by the severance of his relationship with his grandmother."

After hearing the testimony, the trial court ordered the parties to meet with and be independently interviewed by Dr. David Mathis, psychologist. The purpose of the independent evaluation of the parties was to "make a determination as to whether or not visitation rights with the maternal grandmother would be in the best interest of the child, pursuant to T.C.A. 36-6-306 and based on the factors in T.C.A. 36-6-307(d)(2)." The court ordered that copies of the respective

---

[1]Mr. Greg Kilgore, the funeral director, testified that Ms. Hale was so disruptive at the funeral that he threatened to remove her from the premises.

statutes be sent to Dr. Mathis "to aid and guide him in regard to relevant factors to be considered."

According to the report, the parties met with Dr. Mathis on various dates in February of 2001.[2] Dr. Mathis interviewed Ms. Hale, Mr. Culpepper, and the child independently.

Dr. Mathis met with the child on two occasions and felt that there was no evidence during his interview or through the child's drawings that there was any type of psychological distress. Dr. Mathis felt the child to be a very reliable informant who was able to give relevant and accurate information about his background, surroundings, family, and activities. Dr. Mathis did not feel that the child had been coached or was under duress to respond to the questions in any particular way because the child's responses appeared to be natural and of his own volition.

Dr. Mathis asked the child extensively about his feelings and wishes in regard to the possible visitation with Ms. Hale. The report indicates:

> When asked how he would feel if the judge decided for him to have visits with his maternal grandmother, he responded that he would be "really mad." When the examiner inquired as to his reasons, he reported that "I just don't like her." Upon further inquiry, he reported that "sometimes she is mean and won't let me touch anything." When asked as to his last contact with her, he responded that he wasn't sure but maybe five months ago or so.

> . . . He was aware that Ms. Hale had accused his father of "shooting" his mother. He defended his father against this accusation. When asked about his knowledge of the accusation, he reported that his father had related this to him. He was also aware that his father and Ms. Hale did not like each other. The examiner asked [the child] whether his father would be mad at him if he wanted to see his maternal grandmother. He related: "No, he said it was my choice" and further stated that he would not be mad if it was [the child's] choice.

> When the examiner inquired as to whether or not he would like to or felt a need to see his maternal grandmother he responded with "No." When the examiner inquired as to his reasons for this he responded: "I just know it for some reason." The examiner inquired as to his maternal aunts and uncles. He responded that he does not see them but related that he "used to see Joe Don" and that "he's my favorite." He reported that he had not seen him much since his maternal grandmother had "sent him out and made him move out." The examiner further inquired as to whether or not phone contact with his grandmother would be something he desired. He again stated no interest in this and then related that he talked to her when she came over to

---

[2]The report indicates that the dates of service occurred in 2002, but the trial court order noting receipt of the counseling report by the court was entered on March 19, 2001. The 2002 date in the counseling report was evidently in error.

the school,[3] but that he was bothered by this. He stated that "even when we tell her she is not supposed to, she keeps doing it." He stated emphatically that he "would never want her to come over" in regards to coming to his school. He then also expressed some worry that she might again appear at his school. The examiner asked [the child] what he would tell the judge, if given the chance, about visiting his maternal grandmother. He related: "I would tell him I wouldn't want to go." The examiner then asked what he would tell the judge, if asked, if his maternal grandmother could some over to see him. He related: "No. I just wouldn't want her to come over."

Dr. Mathis also met with Mr. Culpepper on two occasions, and administered the Minnesota Multiphase Personality Inventory- II, or MMPI-II to Mr. Culpepper on a third occasion. Dr. Mathis felt that Mr. Culpepper's MMPI-II score did not suggest any significant psychological disturbance or maladjustment, but did suggest that he felt persecuted. Dr. Mathis opined that these feelings probably stemmed from this litigation. They extensively discussed Mr. Culpepper's background, including education, work history, and family relationships. Mr. Culpepper reported extreme sadness about his wife's death but also anger toward Ms. Hale for her accusations.

Dr. Mathis also met with and interviewed Ms. Hale on two occasions. Dr. Mathis expressed that Ms. Hale was very tearful and at times emotional during the interviews. He also felt that she was defensive in her answers and exhibited some distress when questioned about statements made by Mr. Culpepper. Dr. Mathis felt that Ms. Hale's MMPI-II results decreased her credibility as an informant. She told Dr. Mathis that she felt she had a great bond with the child and that he needed her relationship. The report indicates that

> The examiner inquired as to her motivations for requesting visitation time with [the child]. She expressed her concern for [the child] as well as her affection for him. She views [the child] as an extension of her daughter and expressed her deep grief over her daughter and thus not wanting to also lose contact with [the child]. Ms. Hale then began to express concern about his safety and happiness. When the examiner inquired further about her safety concerns for [the child], she related her belief that Mr. Culpepper was responsible for her daughter's death.
>
> . . . .
>
> . . . Her thoughts regarding Mr. Culpepper's involvement in her daughter's death are fixed. Yet she stated her belief that she could "respect him as [the child's] father." She rejects the findings from previous investigations.

The report's summary of the relevant background and includes the statement that

---

[3]Earlier in the interview, the child reported that Ms. Hale had unexpectedly shown up at his school on two occasions and that he had been upset by this behavior.

Ms. Hale was reported to have immediately begun accusing Mr. Culpepper of being culpable in her daughter's death. Ms. Hale continues to hold the belief that Mr. Culpepper is responsible for her death. Based on this belief, there has been a significant amount of hostility and acrimony between these two parties.

Dr. Mathis also submitted detailed conclusions as to each of the examinees. He concluded, in part, that

> . . . the risk exists that Ms. Hale's behavior could be influenced by her emotional reasoning and thus could be emotionally distressing to [the child]. In addition, [the child] does not desire a relationship with her. His prior relationship with her was dependent upon the presence of others, namely, his mother. He has not had overnight visits by himself with Ms. Hale and does not appear to have a bond with her despite Ms. Hale's belief to the contrary.

> . . . .

> It appears that an absence of visitation with his grandmother will <u>not</u> be harmful to [the child]. In fact, given the hostility and suspicion between Ms. Hale and Mr. Culpepper, visitation with Ms. Hale would likely increase the stress for [the child] and thus could even be detrimental. Mr. Culpepper should be trusted to look after the emotional well being of his son, especially considering the loss of [the child's] mother.

In March of 2001, the trial court ordered the parties to submit to mediation. Apparently, the attempt at mediation was unsuccessful, because the next, and final, order from the trial court appears to have been entered on July 19, 2002, after a June 24, 2002 hearing. The trial court found at that time that: (1) Ms. Hale had standing to seek grandparent visitation pursuant to Tenn. Code Ann. § 36-6-306; (2) visitation by Ms. Hale would be in the best interest of the minor child based on the factors in Tenn. Code Ann. § 36-6-307(d)(2) in that prior to the death of her daughter, there was a significant existing relationship between Ms. Hale and the child; (3) the total absence of a relationship between the child and Ms. Hale and the maternal side of the child's family would result in substantial harm to the child; and (4) there had been no significant hostility directed by Ms. Hale toward Mr. Culpepper in the presence of the child.

As a result of these findings, the trial court ordered that a six hour period of visitation take place on one weekend day per month at either the home of Ms. Hale or a place of her choosing. The trial court also ordered another counseling session to take place six months from the date of the order[4] with Dr. Mathis and that Dr. Mathis submit a sealed report from that session to the court. At that time, the court would entertain argument by counsel on whether the visitation should continue.

---

[4] It is not clear from the record if this counseling session ever took place.

II.

A parent has a fundamental right to the care, custody and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 1212-13 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996); *In Re Adoption of a Female Child*, 896 S.W.2d 546, 547 (Tenn. 1995); *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994). Parents are protected in the rearing of their children from unwarranted intervention by the United States Constitution and the Tennessee Constitution. This right is a fundamental but not absolute right, and the state may interfere with parental rights only if there is a compelling state interest. *Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 1391 (1982); *Nash-Putnam*, 921 S.W.2d at 174-75. A compelling state interest sufficient to justify judicial interference with parental decisions is the need to protect the child from substantial harm. *Hawk v. Hawk*, 855 S.W.2d 573, (Tenn. 1993).

Parental decisions to limit a child's relationship with his or her grandparents, including preventing any personal interaction, have been challenged in our courts by grandparents asking courts to order visitation over the parents' objections. The subject has also been addressed by the legislature. In *Hawk*, the Tennessee Supreme Court held,

> "Article I, Section 8 of the Tennessee Constitution protects the privacy interest of these parents in their child-rearing decisions, so long as their decisions do not substantially endanger the welfare of the children. Absent some harm to the child, we find that the state lacks a sufficiently compelling justification for interfering with this fundamental right.

*Hawk*, 855 S.W.2d at 582. The court concluded that the then-existing grandparent visitation statute was unconstitutional as applied to parents whose fitness was unchallenged. *Id*. at 577.

Courts cannot grant grandparent visitation solely on the basis of a best interest of the child analysis. Instead, the threshold requirement is a finding that the child is at risk of substantial harm. *Simmons v. Simmons*, 900 S.W.2d 682, 685 (Tenn. 1995). Legislative enactments that allow courts to order grandparent visitation upon a finding of the best interests of the child have been found to constitute "an unconstitutional invasion of privacy rights under the Tennessee Constitution." *Ellison v. Ellison*, 994 S.W.2d 623, 624 (Tenn. Ct. App. 1999).[5]

In 2000, the legislature, in apparent recognition of the Constitutional requirements established in the earlier cases, amended Tenn. Code Ann. § 36-6-306. Under the amended statute,

---

[5] The statute at issue in *Ellison* was the 1997 version of Tenn. Code Ann. § 36-6-306, and the court found it was essentially the same as earlier versions examined by the Supreme Court in *Hawk* and *Simmons* because it allowed for a court-ordered visitation on the basis of a best interests finding without a danger of harm pre-requisite.

the threshold determination to be made by the court is whether there is a danger of substantial harm to the child. The procedure for a trial court to follow in considering a petition for grandparent visitation is set out:

> (b)(1) In considering a petition for grandparent visitation, the court shall first determine the presence of a danger of substantial harm to the child. Such finding of substantial harm may be based upon cessation of the relationship between an unmarried minor child and the child's grandparent if the court determines, upon proper proof, that:
>
> > (A) The child had such a significant existing relationship with the grandparent that loss of the relationship is likely to occasion severe emotional harm to the child;
> >
> > (B) The grandparent functioned as a primary caregiver such that cessation of the relationship could interrupt provision of the daily needs of the child and thus occasion physical or emotional harm; or
> >
> > (C) The child had a significant existing relationship with the grandparent and loss of the relationship presents the danger of other direct and substantial harm to the child.

Tenn. Code Ann. § 36-6-306(b)(1).

A "significant existing relationship" is established if the child either resided with the grandparent for at least six (6) consecutive months, the grandparent was a full-time caretaker of the child for a period of not less than six (6) consecutive months, or the grandparent had frequent visitation with the child for a period of not less than one (1) year. Tenn. Code Ann. § 36-6-306(b)(2). Only upon an initial finding of danger of substantial harm to the child, "the court shall then determine whether grandparent visitation would be in the best interests of the child based upon the factors in § 36-6-307" and order reasonable visitation.

Tenn. Code Ann. § 36-6-307 lists seven factors and states that the court "shall consider all pertinent matters, including, but not necessarily limited to" those factors in determining the best interests of the child. Those factors are:

> (1) the length and quality of the prior relationship between the child and the grandparent and the role performed by the grandparent;
> (2) the existing emotional ties of the child to the grandparent;
> (3) the preference of the child if the child is determined to be of sufficient maturity to express a preference;
> (4) the effect of hostility between the grandparent and the parent of the child manifested before the child, and the willingness of the grandparent, except in case of

abuse, to encourage a close relationship between the child and the parent or parents, or guardian or guardians of the child;

(5) the good faith of the grandparent in filing the petition;

(6) if the parents are divorced or separated, the time-sharing arrangement that exists between the parents with respect to the child; and

(7) if one (1) parent is deceased or missing, the fact that the grandparents requesting visitation are the parents of the deceased or missing person.

Tenn. Code Ann. § 36-6-307.

The statute allows a court to proceed to a determination of whether grandparent visitation would be in the best interests of the child only after a finding of the danger of substantial harm. However, the statute authorizes a finding of substantial harm to be based upon the cessation of the grandparent-grandchild relationship itself.[6] It is debatable whether our Supreme Court's holdings on parental rights could be read to sanction interference with decisions by fit parents based upon the absence of a relationship with a grandparent.[7] *See Dugan v. Myers*, No. E2001-00281-COA-R3-JV, 2001 WL 1117514, at *2 (Tenn. Ct. App. Sept. 24, 2001) (no Tenn. R. App. P. 11 application filed) (Susano, J. concurring); *Terry v. Botts*, No. E2000-01288-COA-CV, 2001 WL 173207, at *8 (Tenn. Ct. App. Feb. 22, 2001) (no Tenn. R. App. P. 11 application filed) (Susano, J. concurring). While in *Hawk* the Supreme Court stated that state interference with parenting decisions must be based on significant harm to the child resulting from those decisions, 855 S.W.2d at 581, it also specifically rejected the "presumptive analysis" and "unquestioning judicial assumption" that grandparent-grandchild relationships always benefit children. *Id*. at 581-82.

The trial court herein found that prior to the mother's death there existed a significant relationship between the child and his grandmother as defined in Tenn. Code Ann. § 36-6-306(b)(2). Regardless of whether the evidence supports that finding, there is simply no evidence of the danger of substantial harm to the child because of the cessation of that relationship or otherwise. There is no evidence that Mr. Culpepper is anything but a fit parent or that the child is in any danger of harm from his living environment or from Mr. Culpepper's parenting decisions. The court found that the total absence of a relationship with the grandmother and the maternal side of his family would result in substantial harm to the child. There is simply no proof of such harm. The psychologist appointed by the court, relying in part on the child's statements, reported a conclusion contrary to the finding.

---

[6]Ms. Hale argues that the statute creates a rebuttable presumption that if there were an existing relationship between grandchild and grandparent that was significant enough, the loss of that relationship would likely cause severe emotional harm to the child. Tenn. Code Ann. § 36-6-306(b)(1)(A). Even if that were a correct and Constitutional interpretation of the statute, an issue which we do not reach, Mr. Culpepper presented evidence rebutting any such presumption.

[7]We need not decide that question, however, because of our disposition on the facts of the case and because the father has not challenged the validity of the statute or the constitutionality of its application herein.

Ms. Hale asks us to give more weight to the findings of the trial court than the testimony of Dr. Mathis. Of course, pursuant to the Tennessee Rules of Appellate Procedure, our review of this record is *de novo* upon the record of the trial court, accompanied by a presumption of correctness of factual findings, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Cross v. City of Memphis*, 20 S.W.3d 642, 643 (Tenn. 2000). Thus, we would presume the correctness of the trial court's findings if they are supported by evidence in the record.

However, Ms. Hale does not direct us to any testimony or other evidence that *this* child would be harmed by loss of contact with his grandmother. There is none in the Statement of the Evidence. We are asked to simply presume that would be the effect, and this we cannot do. *See Hawk*, 855 S.W.2d at 581-82. In addition, where the applicable standard is a risk of substantial harm,

> . . . the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to believe that the harm will occur more likely than not.

*Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2002).

Our review of the record before us requires the conclusion that the evidence preponderates against the trial court's findings of fact. The threshold determination of the danger of substantial harm has not been established. Thus, Mr. Culpepper is entitled to protection of his parental rights.

Mr. Culpepper's decision to remove Ms. Hale from his child's life is one that is extremely painful to Ms. Hale, especially in view of the loss of her daughter. Regardless of whether someone else, including members of this court, might make a different decision, or whether it might be better for the child to allow visitation, those are simply not grounds to allow the state, through the courts, to interfere with Mr. Culpepper's child-rearing decisions.

We reverse the decision establishing grandparent visitation and remand the case. The costs of the appeal are taxed to the appellee, Alice Hale.

_____
PATRICIA J. COTTRELL, JUDGE