IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 4, 2005

IN RE C.L.M., M.M.M., AND S.D.M.

Appeal from the Juvenile Court for Dickson County
No. 11-04-066-CC    A. Andrew Jackson, Judge

No. M2005-00696-COA-R3-PT - Filed August 25, 2005

Mother appeals the Dickson County Juvenile Court's Order terminating her parental rights to three children, C.L.M., M.M.M., and S.D.M. Father does not challenge the trial court's termination of his parental rights. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL and FRANK G. CLEMENT, JR., JJ., joined.

Nathan T. Brown, Dickson, Tennessee, for the appellant, A.H.S.

Paul G. Summers, Attorney General and Reporter; Douglas Earl Dimond, Sr. Counsel, for the appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

The children involved in this case came into the custody of the state on November 14, 2002, because Mother tested positive for cocaine, opiates, and benzodiazapine upon giving birth to her youngest child, S.D.M. Furthermore, Mother insisted on breast feeding S.D.M. and sleeping with her against medical advice. On December 31, 2002, Department of Children's Services (DCS) worker, Mary Cunningham, entered into a Permanency Plan with Mother, in which Mother agreed to meet various requirements in order to regain custody of her children. The Permanency Plan stated in pertinent part that Mother must:

1. Remain drug free and maintain sobriety; including submitting to random drug screens and being negative for all substance abuse screens and going to NA/AA meetings and turning in weekly timesheets.
2. Find employment.
3. Visit the children on a regular basis, free of the influence of alcohol or drugs.

4. Have suitable housing for the children.

5. Have the ability to legally transport her children in a reliable vehicle, including obtaining a driver's license and insurance.

6. Attend counseling and psychiatric appointments.

7. Successfully complete her probation in Dickson and Hickman Counties without incurring any more charges.

A second plan was adopted in July 2003, while Mother was incarcerated on forgery charges, adding adoption as a goal and requiring that Mother undergo a psychological examination. In December 2003, a third plan was developed, adding therapeutic visitation with the children to be supervised by Residential Services, Inc. Finally, a fourth plan was created in June 2004.

Despite DCS's persistent efforts to rehabilitate and their warnings that failure to comply with the provisions of the care plan were grounds for termination of parental rights, Mother engaged in several acts of criminal behavior and continued her drug abuse. Mother used cocaine for approximately six months after the removal of the children, her last positive test for cocaine being in May 2003. She was arrested in January 2003 for writing a bad check and again in March 2003 for failure to appear. Finally in May 2003, Mother was arrested for theft and forgery, for which she served three months in jail.

Following her incarceration, Mother entered a court-ordered in-patient drug treatment program at Buffalo Valley on September 3, 2003. She completed her treatment on October 6, 2003 with the recommendation to enter a half-way house. She left the half-way house after ten days and moved in with T.S., a recovering drug addict whom she had met at Buffalo Valley and known approximately two weeks. The couple married on May 19, 2004. Since the time Mother moved in with T.S., she has failed to provide DCS with any verification of her attendance at NA/AA meetings as required by the Permanency Plan.

Mary Cunningham, Mother's DCS case worker, testified about her concerns that Mother's repeated drug use and violence prevented Mother from becoming a stable and supportive parent. First, Mother tested positive for opiates and Xanax in her most recent drug test in October 2004. She also failed to attend two of her drug tests, one scheduled for January 21, 2004 and the another on November 24, 2004. Despite Mother's failure to remain drug free, Cunningham conceded that Mother had met the other requirements of the Permanency Plan which included obtaining a driver's license and maintaining a home and job. However, Mother failed to contribute to any of the children's support since the children were placed into state custody, despite advisement from DCS on December 31, 2002, that willful failure to contribute to the support of the children was grounds for termination of parental rights.

In addition to drug use, there has been a history of domestic violence at Mother's household. In December 2003, T.S.'s mother called the police as a result of an argument between the couple, in which officers arrested Mother on an outstanding warrant. T.S. claimed Mother threatened to blacken her own eyes and call the police to get him in trouble. In October 2004, officers were dispatched as a result of T.S.'s claim that Mother had assaulted him. T.S.'s face was scratched and

he told officers that Mother came home at 4:30 a.m., asking for a Lortab. T.S. claims Mother hit him after he called her a sorry excuse for a mother. Both parties admitted to the officer that there had been physical abuse between them on several occasions. T.S. also conceded that his prescription Xanax pills were often missing and he could not account for their disappearance.

Molly O'Neal, a counselor for Kids First, provided weekly in-home services to Mother and T.S. from August to December 2004 concerning parenting and permanency plan issues. O'Neal felt Mother was controlling and physically and emotionally abusive to her mother and T.S. After a confrontation between Mother and her therapist, O'Neal thought Mother's anger management and emotional abuse issues were too significant to be effectively treated in her anger management classes. O'Neal also conveyed concerns about Mother's continued drug abuse, specifically stating that T.S. told her that Mother took large amounts of Lortab, using not only her own prescriptions, but his as well.

Mother has had an extensive and troubling prescription drug history beginning in February 2004 and continuing up until the time of trial. On February 26, 2004, Mother filled two prescriptions from Dr. Delaplane, one for 30 Hydrocodone (Lortab) and another for 30 Alprazolam (Xanax). In March 2004, she filled two prescriptions from Dr. Delaplane, one for 40 Hydrocodone (Lortab) and another for 40 Alprazolam (Xanax). In April 2004, Mother filled 3 prescriptions from Dr. Delaplane, including 40 Hydrocodone (Lortab) and 40 Alprazolam (Xanax). She also filled five additional prescriptions from Dr. Burrow for other medication. In May 2004, Mother filled four prescriptions from Dr. Delaplane, two for a total of 70 Hydrocodone (Lortab) and two for a total of 70 Alprazolam (Xanax). In June 2004, Mother had her first visit with Dr. Delaplane as a patient and she filled eight prescriptions from him totaling 90 Hydrocodone (Lortab) and 90 Alprazolam (Xanax). In July 2004, Mother filled eight prescriptions from Dr. Delaplane, which included a total of 120 Hydrocodone (Lortab), 60 Alprazolam (Xanax) and 30 Oxycodone. In August 2004, she filled six prescriptions from Dr. Delaplane, five for a total of 150 Hydrocodone (Lortab) and one for 30 Alprazolam (Xanax). In September 2004, Mother filled ten prescriptions from Dr. Delaplane and two from Dr. Leftwich. Of the ten prescriptions from Dr. Delaplane, she filled three for a total of 80 Hydrocodone (Lortab) and three for a total of 80 Alprazolam (Xanax). In October 2004, Mother filled fourteen prescriptions, all but one from Dr. Delaplane, including five for a total of 120 Hydrocodone (Lortab) and three for a total of 80 Alprazolam (Xanax). In November 2004, she filled eleven prescriptions from Dr. Delaplane, which included five prescriptions for a total of 140 Hydrocodone (Lortab) and four prescriptions for a total of 120 Alprazolam (Xanax). Finally, in December 2004, Mother filled nineteen prescriptions from Dr. Delaplane, including three for a total of 90 Hydrocodone (Lortab) and three for a total of 90 Alprazolam (Xanax).

Both Mother's treating physician and an expert physician assessed Mother's medical records and concluded that the records demonstrate a pattern of drug abuse. Dr. Delaplane, Mother's treating physician, testified that Mother worked in his office from May 2004 until November 2004 and that he began seeing her as a patient on June 22, 2004. Dr. Delaplane denied having prescribed Mother medication before June 22, 2004, however, pharmacy records showed Mother began filling Dr. Delaplane's prescriptions for Hydrocodone (Lortab) and Alprazolam (Xanax) as early as February 26, 2004. Dr. Delaplane could not explain the discrepancy, suggesting that someone possibly forged

his signature or called in prescriptions under his name or that some of his medical records were missing. Dr. Delaplane testified that his standard practice was to prescribe 30 tablets each of Hydrocodone (Lortab) and Alprazolam (Xanax) for a two-week period. However, Dr. Delaplane prescribed Mother 30 Hydrocodone (Lortab) on July 22, 2004 and five days later, prescribed another 30 Oxycodone. Additionally, Dr. Delaplane prescribed 30 Hydrocodone (Lortab) on November 8, 2004, another 30 Hydrocodone (Lortab) three days later and another 30 Hydrocodone (Lortab) nine days after that. Finally, Dr. Delaplane denied knowledge that Mother was seeing other physicians for drugs at the same time he was treating her. However, Dr. Delaplane's medical records contain notices from TennCare of Mother's emergency room visits. After confronted with these discrepancies, Dr. Delaplane testified that it appeared that Mother had been abusing prescription drugs.

In addition to Dr. Delaplane's medical testimony, Murray W. Smith, M.D. testified as a drug and alcohol specialist. After examining Mother's medical records, Dr. Smith concluded that Mother satisfied all the criteria for addictive behavior. Although Dr. Smith conceded that Mother may be functional despite her prescription drug abuse, the use of Hydrocodone (Lortab) and Alprazolam (Xanax) kept her at high risk for cocaine relapse. He stated that Xanax was not an appropriate medication for chronic pain, likening it to alcohol in pill form, and that the drug is at the top of the list of "extremely addictive" drugs. In Dr. Smith's opinion, Mother maintained her addictive brain chemistry by substituting prescription drugs for cocaine. In addition, Dr. Smith expressed concern over Dr. Delaplane's medical care of Mother. He testified that there are strict professional standards for dealing with a patient, which include obtaining the patient's history, performing a physical examination, and determining whether the patient has a drug or alcohol abuse problem. Dr. Smith stated that Dr. Delaplane failed to meet any of the above requirements, adding that Dr. Delaplane's medical records were not only wholly inadequate, but also fraudulent in that many of the records appeared to be subsequently altered. Dr. Smith also submitted that Mother was getting a lot of drugs from a lot of doctors, evidencing that she was actively feeding her addiction rather than recovering from it.

On May 20, 2004, DCS filed a Petition to Terminate the parental rights of Mother and Father to the children, C.L.M., M.M.M., and S.D.M. The trial took place on January 24, 2005, in the Juvenile Court of Dickson County. By Order entered February 16, 2005, Judge A. Andrew Jackson of the Dickson County Juvenile Court, based on clear and convincing evidence, concluded that Mother and Father's parental rights to these children should be terminated and that such termination was in the best interest of the children. The trial court made the specific findings that:

> The children, [C.L.M., M.M.M. and S.D.M.], originally came to the Court's attention on November 14, 2002, when DCS filed a Petition for Temporary Custody.
> That [Mother] has failed to make an adjustment of circumstance, conduct, or conditions as to make it safe for the children to be returned to her. In November, 2002, when she gave birth to the child, [S.D.M.], [Mother] tested positive for cocaine, opiates and benzodiapines, and the only thing that has changed at this time is the cocaine. The telling parting [sic] is that she received prescription after prescription from Dr. Delaplane and from hospital emergency rooms. She has had two (2) years to do something and she is still on

narcotic drugs. The Court was concerned that she didn't see Dr. Delaplane as a patient until June, 2004, but he was prescribing medicine for her as early as February, 2004. That [Mother] has failed to make an adjustment of circumstance, conduct or conditions as to make it safe for the children to return home. That the physical condition of the home is not safe.
...

## A. Abandonment

In addition, the Court concludes that for a period of at least four months following removal, DCS made reasonable efforts to assist [Mother] and [Father] in establishing suitable homes for the children by arranging visits and to address the conditions leading to the children's coming into DCS custody. Given this proof, the Court concludes DCS made reasonable efforts under the circumstances.

The Court concludes that [Mother] and [Father] have made no reasonable efforts to provide suitable homes for the children, and they have demonstrated a lack of concern for the children to such a degree that it appears unlikely that they would be able to provide a suitable home for the children at an early date. In this case, a suitable home would be one where the children would not be exposed to the drug usage of [Mother]...

As for the lack of concern for the children by [Mother] and [Father], the Court concludes that the proof supports this finding. [Mother] has failed to maintain a drug free home and [Father] failed to maintain contact with DCS. Given this proof, the Court concludes that it is unlikely that they, after failing for over 26 months to have a drug-free home and to remain in contact with DCA, will be able to provide proper homes for the children at an early date. Thus, the Court concludes grounds for termination exist under T.C.A.§36-1-113(g)(1) because [Mother] and [Father] abandoned the children.
...

## B. Substantial Noncompliance with the Permanency Plan's Obligations

[T]he Court concludes that the requirements of [Mother] and [Father] under the 2002 permanency plan were clearly reasonable and related to the remedying the conditions that warranted foster care for their children. It is undisputed that the children, [C.L.M., M.M.M. and S.D.M.], were removed in November, 2002, due to on-going drug addictions of [Mother]. Given the reasons for the children's removal and the tasks on the permanency plans, the Court concludes that the permanency plans' requirements that [Mother] find a suitable or stable, drug free living environment for the children and that [Father] complete an A&D assessment, attend NA/AA meeting, submit to random drug screenings, provide proof of employment, participate in visits, complete parenting classes, and attend schedule meetings/court hearings and to obtain stable housing are clearly reasonable.
...

## C. Persistence of Conditions

It is clear that the children have been removed for more than six months - in fact, for more than 26 months. The children were taken into DCS's custody in November, 2002.

[T]he Court concludes that the conditions, which led to the children's removal, still persist. [Father] has not visited the children since April, 2003, and has never provided any support, financial or emotional, for the children. [Mother] has failed to provide a drug free environment for the children.

The Court also concludes that there are conditions which in all reasonable probability would cause the children to be subjected to further abuse or neglect and which, therefore, prevent the children's safe return to the care of the parents. T.C.A. § 36-1-113(g)(3)(a)(i). The principal condition, which would cause further neglect of the children is the fact that [Mother] continues to have drug issues, and [Father] has shown no interest in them since April, 2003.

Moreover, there is little likelihood that these conditions will be remedied at an early date. [Mother]'s failure to become drug-free demonstrates her lack of desire to gain custody of the children.

Finally, the continuation of the parent and child relationship greatly diminishes the children's chances of early integration into a safe, stable, permanent home. [Mother], by her failure to become drug-free, has proven that she has no interest in providing safe, stable and permanent homes for her children.

Consistent with the requirements of Tennessee Code Annotated section 36-1-113, the court made the following specific findings regarding the best interests of the children:

The Court concludes that termination of parental rights of [Mother] and [Father] is in the children's best interests. [Mother] and [Father] have not made any adjustment of circumstance, conduct, or conditions. They failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such a duration of time that lasting adjustment does not reasonably appear possible. Tenn.Code Ann. §36-1-113(i)(1). [Mother] continues to abuse drugs. Putting the children in the custody of these Respondents would have a devastating effect on their emotional and psychological conditions. Tenn. Code Ann. §36-1-113(i)(5). The Respondents have never paid child support consistent with child support guidelines. Tenn. Code Ann. §36-1-113(i)(9).

Thus, the Court concludes that several factors under §36-1-113(i) are present. Accordingly, termination is clearly in the children's best interest.

From this Order, Mother appeals challenging the court's finding of clear and convincing evidence supporting the statutory grounds and its determination of the children's best interests. Father does not appeal the trial court's decision.

## II. Burden of Proof

Before proceeding to the Mother's issues on appeal, we impart the well-defined standards of review applicable to orders terminating parental rights. It has been recognized by both the United States and the Tennessee Constitutions that parents have a fundamental right the care, custody, and control of their children. *Santosky v. Kramer,* 455 U.S. 745, 754, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Keisling v. Keisling,* 92 S.W.3d 374, 378 (Tenn .2002); *In re Swanson,* 2 S.W.3d 180, 187 (Tenn.1999); *Hawk v. Hawk,* 855 S.W.2d 573, 579 (Tenn.1993); *Ray v. Ray,* 83 S.W.3d 726, 732 (Tenn.Ct.App.2001). Although this right is fundamental, it is not absolute, and the state may interfere with parental rights

if there is a compelling state interest. *Santosky,* 455 U.S. at 747. The Tennessee legislature set forth the grounds in which the state's interest in the welfare of the child justifies parental termination in Tennessee Code Annotated section 36-1-113(g). *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn.App.1998).

In order to terminate parental rights, the state must prove the existence of one of the statutory grounds by clear and convincing evidence and that termination is in the children's best interests. *Santosky*, 455 U.S. at 769-70; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn.2002); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn.App.1989). This Court has recognized that the existence of any one of the statutory bases will support a termination of parental rights. *See In re M.C.G.,* No. 01A01-9809-JV-00461, 1999 WL 332729, at *5 (Tenn.Ct.App. May 26, 1999) (*no perm. app. filed* ); *Department of Children's Servs. v. Darr,* No. 03A01-9706-JV-00213, 1998 WL 128874, at *3 (Tenn.Ct.App. Mar. 24, 1998) (*no perm. app. filed* ); *Department of Human Servs. v. Manier,* No. 01A01-9703-JV-00116, 1997 WL 675209, at *5 (Tenn.Ct.App. Oct. 31, 1997), *perm. app. denied* (Tenn. Mar. 2, 1998).

This court has attempted to describe the clear and convincing evidence standard, explaining that [a]lthough it does not require as much certainty as the "beyond a reasonable doubt" standard, the "clear and convincing evidence" standard is more exacting than the "preponderance of the evidence" standard. *O'Daniel v. Messier,* 905 S.W.2d 182, 188 (Tenn.App.1995); *Brandon v. Wright,* 838 S.W.2d 532, 536 (Tenn.App.1992). In order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 901 n. 3 (Tenn.1992); *O'Daniel v. Messier,* 905 S.W.2d at 188. Such evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. *O'Daniel v. Messier,* 905 S.W.2d at 188; *Wiltcher v. Bradley,* 708 S.W.2d 407, 411 (Tenn.App.1985). In the present case, therefore, this Court must affirm the trial court's decision to terminate the Mother's parental rights if the record contains clear and convincing evidence to support any of the statutory grounds found by the trial court. *See In re M.C.G.,* No. 01A01-9809-JV-00461, 1999 WL 332729, at *5 (Tenn.Ct.App. May 26, 1999) (*no perm. app. filed*); *Department of Children Servs. v. Darr*, No. 03A01-9706-JV-00213, 1998 WL 128874, at *3 (Tenn.Ct.App. Mar. 24, 1998) (*no perm. app. filed*); *Department of Human Servs. v. Manier*, No. 01A01-9703-JV-00116, 1997 WL 675209, at *5 (Tenn.Ct.App. Oct. 31, 1997) *perm. app. denied* (Tenn. Mar. 2, 1998); *see also In re Musick*, No. 03A01-9708-JV-00368, 1998 WL 136561, at *1 (Tenn.Ct.App. Mar. 27, 1998) (*no perm. app. filed).*

There are three statutory grounds at issue in this case, any one of which if proven by clear and convincing evidence, provides grounds to affirm the trial court's decision to terminate parental rights:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;
(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title

37, chapter 2, part 4;

(3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn.Code Ann. 36-1-113(g)(1-3) (Supp.2004).

### III. Persistent Conditions

The primary ground for termination at issue in this case is persistence of conditions as defined by Tennessee Code Annotated section 36-1-113(g)(3)(A). In this case, the children came into DCS custody on November 14, 2002, after Mother tested positive for cocaine, opiates, and benzodiazapine upon giving birth to the youngest child. DCS claims that the children were removed from Mother's custody as a result of her addiction to drugs, specifically, cocaine, and Mother has failed to maintain sobriety since their removal, thereby, creating persistent conditions.

The evidence presented at trial provides clear and convincing evidence that Mother has not maintained sobriety but has instead, merely changed her drug of choice. It was shown that Mother continued to abuse cocaine for at least six months after removal of the children. Following court-ordered in-patient drug treatment, Mother did not remain drug-free, but instead, engaged in serious abuse of prescription drugs, visiting several physicians and emergency rooms, in order to obtain the drugs.

Mother claims her chronic abdominal pain, which subsequently lead to a hysterectomy, legitimizes her use of prescription medication. However, Mother fails to explain the need for such an exorbitant amount of drugs and why she sought prescriptions from multiple doctors at a time, failing to disclose her prior drug addiction and her receipt of medications from other physicians. The expert witness physician and the mother's own physician testified that her behavior is indicative of abuse or addiction to prescription drugs.

Mother further argues that despite her extensive use of prescription drugs, she is still functional and therefore worthy of continued parental rights. Mother relies on *In re D.C.,* where the mother's children were initially removed by DCS due to the mother's alcohol abuse. *In re D.C.*, 2004 WL 2492278 *1 (Tenn.Ct.App. Nov. 3, 2004). The trial court terminated the mother's parental rights based on persistent conditions as a result of the mother's failure to cease drinking, however, the appellate court reversed finding a lack of clear and convincing evidence. *In re D.C.*, 2004 WL 2492278 at *5-7. The case at issue is substantially dissimilar from *In re D.C.* First, the mother in *In re D.C.* never failed an alcohol screen, whereas here, Mother has failed multiple tests. *In re D.C.*, 2004 WL 2492278 at *3. Additionally, there was credible evidence showing the mother in *In re D.C.* was not participating in activities involving the use of alcohol and may in fact, not even have a problem with the consumption of alcohol. Furthermore, the only evidence that the trial court had regarding the continued use of alcohol was a DUI charge, but there was a discrepancy whether her altered state giving rise to the charge was created by alcohol or prescription drugs. *In re D.C.*, 2004 WL 2492278 at *6. In this case, the record is replete with evidence of Mother's prescription drug abuse. The inquiry here is not whether Mother is functional in her prescription drug abuse state, but rather, whether the children will be subjected to further abuse or neglect if returned to the care of their Mother. In this respect we concur with the findings of the trial court that further abuse and neglect is inevitable.

Next, it does not appear that Mother will cease her abuse of prescription drugs in the near future. After DCS took custody of the children, Mother continued to use cocaine for at least six months, producing her last positive test for cocaine in May 2003. In addition, Mother tested positive for opiates and Xanax in her most recent drug test in October 2004. Further, Mother failed to appear at two scheduled drug tests one on November 24, 2004 and another on January 21, 2004, just three days before trial. Mother's inability to remain drug-free for the 26 months prior to trial indicate to the Court that Mother is highly unlikely to remedy her abuse of drugs in the near future.

Finally, there is clear and convincing evidence that continuation of Mother and the children's relationship greatly diminishes the children's chances of early integration into a stable and permanent home. Since the time of the children's removal on November 14, 2002, the children have resided with a stable and loving family. DCS case manager, Mary Cunningham, testified that "[t]he foster parents have become parents to the young children." The children's foster mother testified that the family hopes to adopt all three children, if Mother's parental rights are terminated.

### IV. Substantial Noncompliance

Mother next challenges the trial court's finding of substantial noncompliance with the terms of the permanency plan as defined by Tennessee Code Annotated section 36-1-113(g)(2). According to the first Permanency Plan entered into on December 31, 2002, Mother agreed to maintain her sobriety, submit to random drug screens and remain negative for all substance abuse screens.

However, Mother tested positive for the presence of drugs in her last drug screen and failed to appear for two others. In addition, Mother's extensive prescription drug abuse history beginning in February 2004 and continuing up until the time of trial, further evidences her failure to comply with the express terms of the agreed Permanency Plan. The foregoing violations provide clear and convincing evidence of substantial noncompliance with the Permanency Plan.

## V. Abandonment

Mother also contends that she did not abandon her children pursuant to Tennessee Code Annotated section 36-1-113(g)(1). Tennessee Code Annotated section 36-1-102 provides:

(1)(A) "Abandonment" means, for purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, that:

(ii) The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date;

Tenn.Code Ann. § 36-1-102(1)(A)(ii).

It is undisputed that the children have consistently remained in state custody for over two years. The failed drug tests and the testimony of both the expert medical physician and Mother's own primary care physician establish that Mother continued her substance abuse during the children's absence.

The Court must also consider whether DCS made reasonable efforts to make it possible for the children to return home. The burden of proving that reasonable efforts have been made lies with DCS. Tennessee Code Annotated section 37-1-166(b). Reasonable efforts is a fact intensive inquiry and must be examined on a case-by-case basis. *State v. Puryear*, 2005 WL 735038, *9 (Tenn.Ct.App. Mar. 30, 2005). "Reasonable efforts" as defined by the legislature is "the exercise of reasonable care and diligence by the department to provide services related to meeting the needs

of the child and the family." Tennessee Code Annotated section 37-1-166(g)(1) (2003).  However, the burden of family reunification does not lie entirely with DCS as reunification is a "two-way street."  *State Dept. of Children's Services v. Belder,* 2004 WL 1553561, *9 (Tenn.Ct.App. July 9, 2004).

It appears from the record, that DCS made efforts to facilitate the return of the children to their mother's home.  Under the second Permanency Plan devised in July 2003, Mother obtained a psychological examination.  A third Permanency Plan entered into in December 2003, provided for therapeutic visitation with the children supervised by Residential Services, Inc.  DCS case manager, Mary Cunningham, conducted a court ordered home study on January 19, 2003. Furthermore, a counselor from Kids First provided weekly in-home parenting and permanency plan counseling from August to December 2004.  Finally, Mother and T.S. underwent individual and marriage counseling at Centerstone in Lewisburg.  The difficulty in a fact-intensive inquiry when applied to this case and to "abandonment" under the statutory definition lies in the timing of reasonable efforts on the part of both DCS and the parent.  The statute provides in pertinent part: "and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parents(s) or guardian(s) have made no reasonable efforts to provide a suitable home."  Tenn.Code Ann. § 36-1-102(1)(A)(ii).  When isolating this four-month period, the record does not establish by clear and convincing evidence that abandonment has been sustained.

## VI. Best Interests of the Children

Despite the existence of persistent conditions and substantial noncompliance with the permanency plan, the Court must also find that parental termination is in the best interests of the children. Tennessee Code Annotated section 36-1-113(i) (Supp.2003) lists a set of non-exhaustive factors to consider in determining the best interests of the child.  The statute does not require fulfillment of every factor before a court can find that termination is in a child's best interest. *State of Tenn. Dep't of Children's Servs. v. T.S.W.,* No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn.Ct.App. May 10, 2002) (*no perm. app. filed*).  The statute provides the following factors:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's

emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental

to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

This Court agrees with the trial court's determination that termination of Mother's parental rights is in the children's best interests. The mother has failed to make such an adjustment of her conduct as to make it safe for the children to return home since she continues to abuse drugs despite reasonable efforts by DCS. Mother has failed to remain drug-free since her children's removal over 26 months ago, making a lasting adjustment seem unlikely. In addition, the foster parents have cared for C.L.M. and M.M.M. since they were three and S.D.M. since she was born. It appears they are thriving in this environment and removal is likely to be detrimental to their emotional and psychological condition. Furthermore, Mother continues to use controlled substances in the home, rendering Mother consistently unable to care for the children in a safe and stable manner. Finally, Mother has failed to pay child support in a manner consistent with child support guidelines.

Clear and convincing evidence establishes substantial non-compliance with the Permanency Plans and persistence of conditions leading to removal. Clear and convincing evidence establishes that termination of parental rights is in the best interests of all three children. The judgment of the trial court is affirmed as to these grounds for termination and as to best interest, and the case is remanded to the trial court for such further proceedings as may be necessary.

Costs of the appeal are assessed against Appellant.

_____
WILLIAM B. CAIN, JUDGE